# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION

_____

On Appeal from the United States District
Court for the District of Utah,
No. 2:24-md-03102-RJS-DAO (Hon. Robert J. Shelby)

_____

## RESPONSE BRIEF FOR DEFENDANTS-APPELLEES
_____

RANDY T. AUSTIN
JUSTIN W. STARR
KIRTON MCCONKIE
36 S. State Street, Suite 1900
Salt Lake City, UT 84111
(801) 328-3600
raustin@kmclaw.com

MARK S. MESTER
LATHAM & WATKINS LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
(312) 876-7700
mark.mester@lw.com

JASON R. BURT
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
jason.burt@lw.com

PAUL D. CLEMENT
ANDREW C. LAWRENCE
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendants-Appellees*

ORAL ARGUMENT REQUESTED

September 22, 2025

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), The Church of Jesus Christ of Latter-day Saints (Church) certifies that it is a Utah corporation sole that issues no stock and does not have a parent corporation. The Church is a successor to Corporation of the President of the Church of Jesus Christ of Latter-day Saints. Ensign Peak Advisors, Inc. (Ensign Peak) certifies that it is a non-profit corporation formed under Utah law that is tax-exempt under §501(c)(3) of the Internal Revenue Code. Ensign Peak issues no stock and has no parent; it is a supporting organization to and an integrated auxiliary of the Church.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF AUTHORITIES............................................... iv

STATEMENT OF PRIOR OR RELATED APPEALS ........................... 1

INTRODUCTION ..................................................... 1

STATEMENT OF THE ISSUES ......................................... 4

STATEMENT OF THE CASE............................................ 4

    A.    Church History and Teaching................................ 4

    B.    Whistleblowers and Other Litigation ..................... 9

    C.    This Belated Lawsuit ................................... 12

SUMMARY OF ARGUMENT............................................. 16

ARGUMENT ....................................................... 18

I.    The District Court Correctly Concluded That Plaintiffs' Claims Are Time-Barred.................................................. 18

    A.    No Plaintiff Filed a Complaint Within the Three-Year Limitations Period .......................................... 19

    B.    Plaintiffs' Contrary Arguments Are Unpersuasive............. 24

II.    The District Court Correctly Concluded That Plaintiffs Failed to Adequately Plead Their Claims .................................. 33

    A.    Fraudulent Misrepresentation & Fraudulent Inducement ........ 33

    B.    Fraudulent Concealment ................................. 38

    C.    Unjust Enrichment....................................... 40

    D.    Breach of Fiduciary Duty ................................ 41

III.    The First Amendment Independently Forecloses This Lawsuit.......... 46

A.    The Church Autonomy Doctrine Prohibits Lawsuits Against Churches Unless the Disputes Are Purely Secular............................. 46

B.    Plaintiffs' Lawsuit Is Squarely Barred by the Church Autonomy Doctrine........................................................................... 49

CONCLUSION .................................................................................................... 56

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
387 F.Supp.3d 71 (D.D.C. 2019) ................................................................. 49-50

*Baldwin v. Burton*,
850 P.2d 1188 (Utah 1993) ......................................... 19, 20, 24, 31

*Bell v. Presbyterian Church (U.S.A.)*,
126 F.3d 328 (4th Cir. 1997) ......................................... 49, 50

*Berenda v. Langford*,
914 P.2d 45 (Utah 1996) ...................................................24

*Berrett v. Stevens*,
690 P.2d 553 (Utah 1984) ...................................................40

*Bible Way Church v. Beards*,
680 A.2d 419 (D.C. App. 1996) ...........................................50

*Bistline v. Parker*,
918 F.3d 849 (10th Cir. 2019)......................................... 24, 27-28

*Brody v. Bruner ex rel. Bruner Fam. Tr.*,
2024 WL 1912555 (10th Cir. May 1, 2024) ............................. 35, 39

*Bronson v. Swensen*,
500 F.3d 1099 (10th Cir. 2007).............................................35

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002)......................................... 47, 49, 50, 54

*Burton v. Chen*,
532 P.3d 1005 (Utah 2023) ...................................................43

*Cahill v. Am. Fam. Mut. Ins. Co.*,
610 F.3d 1235 (10th Cir. 2010)......................................... 35, 39

*Church of Scientology Flag Serv. Org. v. City of Clearwater*,
2 F.3d 1514 (11th Cir. 1993)...............................................54

iv

*Clark v. Pangan,*
    998 P.2d 268 (Utah 2000) ...................................................................43

*Colosimo v. Roman Cath. Bishop of Salt Lake City,*
    156 P.3d 806 (Utah 2007) ....................................................... 20-21, 31

*Commonwealth by Preate v. Cancer Fund of Am., Inc.,*
    620 A.2d 647 (Pa. Commw. Ct. 1993)...............................................45

*Credit Suisse Sec. (USA) LLC v. Simmonds,*
    566 U.S. 221 (2012).............................................................................18

*Crookston v. Fire Ins. Exch.,*
    817 P.2d 789 (Utah 1991) ........................................................... 34, 36

*Donner v. Nicklaus,*
    197 F.Supp.3d 1314 (D. Utah 2016)...................................................20

*El Pescador Church v. Ferrero,*
    594 S.W.3d 645 (Tex. App. 2019) .....................................................50

*Emergency Physicians Integrated Care v. Salt Lake Cnty.,*
    167 P.3d 1080 (Utah 2007) .................................................................41

*Feinberg v. Comm'r,*
    916 F.3d 1330 (10th Cir. 2019).........................................................36

*Fowler v. Rhode Island,*
    345 U.S. 67 (1953)...............................................................................52

*Franco v. The Church of Jesus Christ of Latter-day Saints,*
    21 P.3d 198 (Utah 2001) .............................................................. 53-54

*Fulcher v. United States,*
    696 F.2d 1073 (4th Cir. 1982)............................................................26

*Gables at Sterling Vill. Homeowners Ass'n, Inc. v.*
    *Castlewood-Sterling Vill. I, LLC,* 417 P.3d 95 (Utah 2018) ....................... 42, 53

*Gaddy v.*
    *Corp. of the President of the Church of Jesus Christ of Latter-day*
    *Saints,* 148 F.4th 1202 (10th Cir. 2025)............................. 1, 11, 34, 35, 47-49, 52

*Gaddy v.*
    *Corp. of the President of the Church of Jesus Christ of Latter-day*
    *Saints*, 665 F.Supp.3d 1263 (D. Utah 2023) ............................................11, 40, 45

*Ghartey v. St. John's Queens Hosp.*,
    869 F.2d 160 (2d Cir. 1989) ..............................................................................20

*Gilbert Dev. Corp. v. Wardley Corp.*,
    246 P.3d 131 (Utah Ct. App. 2010) .............................................................. 38-39

*Grynberg v. Total S.A.*,
    538 F.3d 1336 (10th Cir. 2008) ............................................................ 23, 25, 26

*Harris v. Matthews*,
    643 S.E.2d 566 (N.C. 2007) ..............................................................................50

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) ..........................................................................................46

*Hughes v. Vanderbilt Univ.*,
    215 F.3d 543 (6th Cir. 2000) ............................................................................26

*Huntsman v.*
    *Corp. of the President of the Church of Jesus Christ of Latter-Day*
    *Saints*, 2021 WL 4296208 (C.D. Cal. Sept. 10, 2021).................................. 11-12

*Huntsman v.*
    *Corp. of the President of the Church of Jesus Christ of Latter-day*
    *Saints*, 127 F.4th 784 (9th Cir. 2025)..................................... 1, 7, 9, 12, 36, 50-53

*Huntsman v.*
    *Corp. of the President of the Church of Jesus Christ of Latter-day*
    *Saints*, 76 F.4th 962 (9th Cir. 2023) .............................................................. 9, 12

*In re Briscoe,*
    448 F.3d 201 (3d. Cir. 2006) ...................................................................... 26, 33

*In re Godwin,*
    293 S.W.3d 742 (Tex. App. 2009) ....................................................................50

*In re Nine W. Shoes Antitrust Litig.*,
    80 F.Supp.2d 181 (S.D.N.Y. 2000) ..................................................................29

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
    589 U.S. 178 (2020)........................................................................19

*Jones v. Wolf*,
    443 U.S. 595 (1979)........................................................................47

*Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am.*,
    344 U.S. 94 (1952)..........................................................................54

*Keith v. Mtn. Resorts Dev.*,
    337 P.3d 213 (Utah 2014) ..........................................................51-52

*Kincheloe v. Farmer*,
    214 F.2d 604 (7th Cir. 1954)..........................................................21

*Knight v. Mooring Cap. Fund, LLC*,
    749 F.3d 1180 (10th Cir. 2014) ......................................................35

*Larsen v. Exclusive Cars, Inc.*,
    97 P.3d 714 (Utah Ct. App. 2004)................................................51-52

*Macris v. Sculptured Software, Inc.*,
    24 P.3d 984 (Utah 2001) ................................................................31

*McNellis v. Douglas Cnty. Sch. Dist.*,
    116 F.4th 1122 (10th Cir. 2024)......................................................34

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
    2025 WL 2602899 (5th Cir. Sept. 9, 2025) ....................................48

*Morrison v. Olson*,
    487 U.S. 654 (1988)........................................................................49

*Muir v. Wasatch Front Waste & Recycling Dist.*,
    547 P.3d 863 (Utah Ct. App. 2024)................................................21

*Orlando Millenia, LC v. United Title Servs. of Utah, Inc.*,
    355 P.3d 965 (Utah 2015) ..............................................................43

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020)........................................................................47

*Pace v. Swerdlow*,
 519 F.3d 1067 (10th Cir. 2008) .........................................29

*Parrish v. Arvest Bank*,
 717 F.App'x 756 (10th Cir. 2017) ......................................34

*Patterson v. United States*,
 451 F.3d 268 (1st Cir. 2006) ...................................... 26, 33

*Presbyterian Church in U.S. v.*
 *Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
 393 U.S. 440 (1969) ...........................................................48

*Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*,
 764 F.3d 1268 (10th Cir. 2014) ........................................33

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
 592 U.S. 14 (2020) ...................................................... 48-49

*Russell Packard Dev., Inc. v. Carson*,
 108 P.3d 741 (Utah 2005) ............................. 19, 24-25, 32

*Sekhar v. United. States*,
 570 U.S. 729 (2013) ...........................................................55

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
 426 U.S. 696 (1976) ...........................................................47

*Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*,
 733 F.3d 1251 (9th Cir. 2013) ..........................................20

*Shiozawa v. Duke*,
 344 P.3d 1174 (Utah App. 2018) .....................................25

*Siebach v. Brigham Young University*,
 361 P.3d 130 (Utah Ct. App. 2015) .................................44

*Sierra Club v. Oklahoma Gas & Elec. Co.*,
 816 F.3d 666 (10th Cir. 2016) ..........................................20

*Smith-Haynie v. District of Columbia*,
 155 F.3d 575 (D.C. Cir. 1998) ..........................................20

*Stone v. Salt Lake City*,
   356 P.2d 631 (Utah 1960) ............................................................ 8, 37

*Taylor v. Moore*,
   51 P.2d 222 (Utah 1935) ...................................................................19

*Thompson v. 1-800 Contacts, Inc.*,
   2018 WL 2271024 (D. Utah May 17, 2018) ....................................28

*United Klans of Am. v. McGovern*,
   621 F.2d 152 (5th Cir. 1980) ...........................................................27

*United States v. Ballard*,
   322 U.S. 78 (1944) ...........................................................................48

*United States v. Wright*,
   988 F.2d 1036 (10th Cir. 1993) .......................................................42

*Watson v. Jones*,
   80 U.S. (13 Wall.) 697 (1871) .........................................................47

*Webster v. JP Morgan Chase Bank, NA*,
   290 P.3d 930 (Utah App. 2012) ................................................ 34, 36

*White v. Lucero*,
   135 F.4th 1213 (10th Cir. 2025) ......................................................30

*White v. Padgett*,
   475 F.2d 79 (5th Cir. 1973) .............................................................21

*Wilburn v. Pepsi-Cola Bottling Co. of St. Louis*,
   492 F.2d 1288 (8th Cir. 1974) .........................................................21

*Yazd v. Woodside Homes Corp.*,
   143 P.3d 283 (Utah 2006) ......................................................... 38, 51

*Youngblood v. Auto-Owners Ins. Co.*,
   158 P.3d 1088 (Utah 2007) ..............................................................38

**Statutes**

Cal. Bus. & Prof. Code §17510.8 .........................................................44

Ill. Stat. Ch. 225 §460/16(b) ...............................................................46

Utah Code Ann. §13-22-23 (1953) ...............................................42

Utah Code Ann. §13-22-3(1) (1953) .............................................44

Utah Code Ann. §13-22-4 (1953) ...............................................44

Utah Code Ann. §13-22-4(a) (1953) ............................................44

Utah Code Ann. §78B-2-305(3) ...................................................19

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................... 4, 17, 34, 38

Fed. R. Civ. P. 9(b) ............................................... 4, 15, 17, 34, 38

**Other Authorities**

Bogert's Law of Trusts and Trustees §481 (May 2025) .........................45

Brett G. Scharffs, *The Journey from Persecution to Inclusion: A Case Study of the Church of Jesus Christ of Latter-day Saints in America*, 97 Notre Dame L. Rev. Reflection 264 (2022).....................................4

Compl., *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 21-cv-2504 (C.D. Cal. filed Mar. 22, 2021), Dkt.1..........................................................................11, 23

Compl., *Cook v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 20-cv-80 (D. Utah filed Feb. 10, 2020), Dkt.1......................................................................... 10, 23

Doctrine and Covenants §1:2, 1:4-5, perma.cc/L29R-5C66 ...................5

Doctrine and Covenants §119:4, perma.cc/43UJ-HN8U...........................6

Doctrine and Covenants §120, perma.cc/57JS-DTXR ....................... 7, 50

Doctrine and Covenants §65:2, perma.cc/U7HR-QBUZ .........................5

Dru Stevenson, *Costs of Codification*, 2014 U. Ill. L. Rev. 1129 (2014).......................................................44

Gordon B. Hinckley, *Of Missions, Temples, and Stewardship* (Oct. 1995),
   perma.cc/ZTH7-CQUL .......................................................................7

Gordon B. Hinckley, *The State of the Church* (Apr. 1991),
   perma.cc/G786-37JA .....................................................................6, 7

Gordon B. Hinckley, *The State of the Church* (Oct. 2003),
   perma.cc/M9PV-Y642 ....................................................................5

Ian Lovett & Rachael Levy, *The Mormon Church Amassed $100 Billion.
   It Was the Best-Kept Secret in the Investment World*,
   Wall St. J. (Feb. 8, 2020), perma.cc/WZD2-RK28................................5

Jeffrey Paul Thompson, *Zion's Cooperative Mercantile Institution:  The
   Rise and Demise of the Great Retail Experiment*, *in*
   Business and Religion: The Intersection of Faith and Finance
   (Matthew C. Godfrey & Michael Hubbard MacKay eds., 2018)........................5

Joseph B. Wirthlin, *The Law of the Fast* (Apr. 2001), perma.cc/27B4-
   UYC6 ......................................................................................8

[Proposed] Amended Class Action Compl., *Gaddy*, 665 F.Supp.3d 1263
   (No. 19-cv-554), Dkt.32-1 ..............................................................11, 23

Restatement of Charitable Nonprofit Orgs.
   §2.02 (Am. L. Inst. 2021) ................................................................43

SEC Release No. 96951,
   2023 WL 2160756 (Feb. 21, 2023)......................................................12

Stipulation of Dismissal, *Cook v. Corp of the President of the Church of
   Jesus Christ of Latter-Day Saints*, No. 20-cv-80
   (D. Utah filed July 13, 2020), Dkt.17 ................................................10

The Church of Jesus Christ of Latter-day Saints, *First Presidency
   Statement on Church Finances* (Dec. 17, 2019), perma.cc/69FT-8LF5.............10

The Church of Jesus Christ of Latter-day Saints, *Tithing*,
   perma.cc/9YBV-ZQFD ......................................................................6

## STATEMENT OF PRIOR OR RELATED APPEALS

Pursuant to Tenth Circuit Rule 28.2(C)(3), Appellees The Church of Jesus Christ of Latter-day Saints and Ensign Peak Advisors, Inc. state that there are no prior or related appeals.

## INTRODUCTION

This appeal involves the latest effort by disaffected or former members of The Church of Jesus Christ of Latter-day Saints (Church) to get a refund of their religious alms by cloaking their disagreement with the Church's financial decisions as "fraud." Last month, a three-judge panel of this Court unanimously rejected one such effort. *See Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, 148 F.4th 1202 (10th Cir. 2025). And earlier this year, an 11-judge en banc panel of the Ninth Circuit unanimously did so too. *See Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, 127 F.4th 784 (9th Cir. 2025) (en banc). The third time is not the charm. Indeed, if anything, this last-in-time effort is even more seriously flawed.

Since 1830, the Church has grown from six members to over 17 million, and it is growing today faster than ever before as it seeks to fulfill a divine commission to take the gospel of Jesus Christ to the ends of the Earth. Since the beginning, the Church has funded this mission through "tithes" and other sacrificial donations by Church members. For the Church and members alike, that tithing emanates from scripture and is sacred.

Although scripture obligates Church members to donate a portion of their increase each year to the Church, no scriptural commandment obligates the Church to spend everything that it receives in the same calendar year. To the contrary, the

Church has long made clear that it puts aside portions of donations to prepare for the Church's future growth and to ensure that it can weather hard times. Those reserves are prudently invested. Such investments do not, however, divert money from the Church's mission; rather, they increase the Church's ability to fulfill it. To that end, for decades, the Church has enlisted the help of financial experts at Church-affiliated Ensign Peak Advisors (Ensign Peak) to prudently manage and grow Church funds.

In December 2019, a so-called "whistleblower" previously employed at Ensign Peak drafted a letter to the IRS publicly declaring that the Church's tithing and investments amounted to fraud and protesting that the Church had expended some resources on projects that he deemed too secular. The IRS wisely declined to wade into that religious thicket. But the whistleblower's letter promptly generated a media frenzy—especially between December 2019 and February 2020—and multiple disaffected former Church members, including the plaintiffs in the *Gaddy* and *Huntsman* cases, ran into court claiming fraud.

Plaintiffs here, also disaffected or former Church members, took a decidedly different tack. They sat back for several years before belatedly filing five separate lawsuits between October 2023 and January 2024, only after the *Huntsman* plaintiff obtained a short-lived success before a three-judge Ninth Circuit panel. After the Judicial Panel on Multidistrict Litigation consolidated those lawsuits in the District

of Utah, Plaintiffs filed a consolidated complaint that invoked the IRS letter over 20 times, along with associated media coverage from February 2020.

Like *Gaddy* and *Huntsman*, this is a highly atypical "fraud" case with no allegations of any kind of self-enrichment by Church leaders. Rather, Plaintiffs here allege that the Church engaged in fraud by declining to immediately spend all donations for charitable purposes and by instead investing some for future use; by failing to disclose the extent of its financial holdings; and by using some funds for projects that are purportedly inconsistent with representations by Church leaders or inconsistent with Church teachings and values.

As the district court correctly determined, Plaintiffs' extraordinary complaint is flawed from top to bottom and cannot proceed. Although the court below recognized the significant and weighty questions over whether the First Amendment allows civil courts to adjudicate lawsuits like this one, it avoided those issues by dismissing Plaintiffs' complaint for more quotidian reasons. The applicable statute of limitations in this case establishes a three-year limitations period, which began to run in early 2020 (at the latest) when Plaintiffs had at least constructive knowledge of their claims. Because Plaintiffs did not begin filing their original complaints until late 2023—long after others had sued and only after a Ninth Circuit panel gave them false hope—the claims are time-barred. And timing considerations aside, Plaintiffs' allegations failed to plausibly plead any viable claim.

Plaintiffs' appellate submission does nothing to disturb those conclusions. And if the district court had not dismissed the claims on these non-constitutional grounds, it would have been impossible to avoid or to ignore the obvious First Amendment problems with Plaintiffs' effort to get a refund for their religiously compelled tithing.  Accordingly, whether on non-constitutional or constitutional grounds, this Court should affirm in full.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly determined that Plaintiffs' claims are time-barred.

2.      Whether the district court correctly determined that Plaintiffs failed to state any claim for relief under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

3.      Whether the church autonomy doctrine forecloses Plaintiffs' lawsuit.

## STATEMENT OF THE CASE

### A.      Church History and Teaching

The prophet Joseph Smith Jr. founded the Church in 1830 in New York.  *See* App.V1.124.  For nearly two decades thereafter, religious persecution resulted in several forced migrations of Church members, culminating in a mass exodus to Utah in 1847.  *See, e.g.*, Brett G. Scharffs, *The Journey from Persecution to Inclusion: A Case Study of the Church of Jesus Christ of Latter-day Saints in America*, 97 Notre Dame L. Rev. Reflection 264, 266 (2022).  In light of those experiences, Church leaders recognized a need upon arriving in Utah to create commercial enterprises to

help the Church and its members achieve self-sufficiency.  Those enterprises included a general-goods store—Zion's Cooperative Mercantile Institution—located near Church headquarters in Salt Lake City.  *See* Jeffrey Paul Thompson, *Zion's Cooperative Mercantile Institution:  The Rise and Demise of the Great Retail Experiment*, *in* Business and Religion: The Intersection of Faith and Finance 65, 71-72 (Matthew C. Godfrey & Michael Hubbard MacKay eds., 2018).

Self-sufficiency has remained a central tenet for the Church ever since.  The Church thus counsels its members to avoid debt and to fastidiously save in case of hard times, and the Church's highest religious authorities have ordained that the Church must do the same.  *See* Ian Lovett & Rachael Levy, *The Mormon Church Amassed $100 Billion.  It Was the Best-Kept Secret in the Investment World*, Wall St. J. (Feb. 8, 2020), perma.cc/WZD2-RK28 (cited at App.V1.91) (Lovett & Levy).

At the same time, the Church's mission demands the expenditure of significant funds.  It is a core religious principle, for example, that the Church spread its gospel around the world.  App.V1.124; *see also* Doctrine and Covenants §1:2, 1:4-5, perma.cc/L29R-5C66; *id.* §65:2, perma.cc/U7HR-QBUZ.  As then-President of the Church Gordon B. Hinckley explained in 2003, the Church "is rolling forth to fill the earth."  App.V1.124 (quoting Gordon B. Hinckley, *The State of the Church* (Oct. 2003), perma.cc/M9PV-Y642).  Due to those tireless efforts, the Church today is a global movement, with more than 17 million adherents in over 160 countries.

*See* Add.4. Such growth necessarily requires the Church to commit significant resources—*e.g.*, to satisfy the "constant and pressing need for new facilities." Gordon B. Hinckley, *The State of the Church* (Apr. 1991), perma.cc/G786-37JA (cited at App.V1.144 n.16); *see also, e.g.*, Lovett & Levy, *supra*.

The Church is likewise devoted to its divine mandate to care for the world's vulnerable. *See, e.g.*, App.V1.73. The Church therefore conducts philanthropic missions on a massive scale. In 2023 alone, the Church dedicated more than $1.3 billion and over six million volunteer hours to serving needy communities in nearly 200 countries and territories, on projects ranging from disaster relief to food assistance to educational and vocational programming. *See* App.V1.130 n.7.

Tithing funds are the central means by which the Church finances its mission. Since 1838, the Church has taught that the faithful have a religious responsibility to tithe, which the Church defines as giving "one-tenth of their increase or income." The Church of Jesus Christ of Latter-day Saints, *Tithing*, perma.cc/9YBV-ZQFD; *see* Add.4-5. That personal religious responsibility is not keyed to the Church's current financial needs and thus does not ebb and flow as the Church takes on new projects or as Church membership grows in wealth or size. Instead, the tithing commandment is directed to individuals and derived from sacred text. *See, e.g.*, Doctrine and Covenants §119:4, perma.cc/43UJ-HN8U. The disposition of those funds and other resources by the Church is committed by scripture to "a council,

composed of the First Presidency of [the] Church" and other senior Church leaders. Doctrine and Covenants §120, perma.cc/57JS-DTXR.

If the Church collects more in tithing than it expends in any given year, it does not issue rebates, relax the next year's tithing obligation, or increase its annual expenditures to match and exhaust that year's tithing contributions. Instead, to ensure that the Church remains self-reliant, the Church has long set aside a portion of each year's tithes for a reserve fund. As then-senior-leader Hinckley explained at the Church's April 1991 General Conference (a semi-annual worship service), one "fixed principle[]" of the Church's "financial operations" is that "a fixed percentage of the income"—*i.e.*, of annual tithing funds—"will be set aside to build reserves against what might be called a possible 'rainy day.'" Gordon B. Hinckley, *The State of the Church* (Apr. 1991), perma.cc/G786-37JA (cited at App.V1.144 n.16); *see also* Gordon B. Hinckley, *Of Missions, Temples, and Stewardship* (Oct. 1995), perma.cc/ZTH7-CQUL (cited at App.179 n.2) ("[E]ach year we put into the reserves of the Church a portion of our annual budget."). In that reserve fund, moreover, the Church draws a distinction between the principal funds—*i.e.*, the donated tithing funds—and any earnings on those funds, though all such funds are irrevocably dedicated to the Church's mission. *See Huntsman*, 127 F.4th at 790.

In addition to tithing donations, the Church accepts donations in two other forms: "fast offerings" and "philanthropic contributions." Add.5-6. The Church

encourages members to fast for two consecutive meals once per month and to donate an amount equal to or greater than the value of the two forgone meals. *See* Joseph B. Wirthlin, *The Law of the Fast* (Apr. 2001), perma.cc/27B4-UYC6 (cited at App.V1.73). That money is used to help the poor with things such as food, clothing, and housing. Philanthropic contributions are charitable gifts to support the Church's Humanitarian Aid Fund, General Missionary Fund, or General Fund. Add.5-6; App.V1.73-82.

Although a Church department initially managed any funds not immediately expended, the Church in 1997 formed Ensign Peak—a §501(c)(3) non-profit organization—to assist with the effort. App.V1.63, 83. Because expending all the Church's funds "immediately" would defy "common sense and common knowledge," *Stone v. Salt Lake City*, 356 P.2d 631, 634 (Utah 1960), Ensign Peak serves the Church by "hold[ing]" and prudently "invest[ing]" Church funds, thereby generating returns that the Church can use for religious purposes down the line, Add.7. Ensign Peak's articles of incorporation thus specify that the funds under its management are "irrevocably dedicated to religious, educational and charitable" projects. App.V1.84.

As relevant here, one such project came about in the early 2000s. At that time, the area in Salt Lake City surrounding the site of the historic and religiously significant Zion's Cooperative Mercantile Institution had deteriorated, threatening

the Church's iconic Temple Square. Church leaders felt a "compelling" religious "responsibility" to "revitalize" it, in a project known as "City Creek." *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, 76 F.4th 962, 979 (9th Cir. 2023) (Korman, D.J., concurring in part and dissenting in part). To do so, the Church allocated to the City Creek project approximately $1.4 billion of the earnings generated by Ensign Peak's investments, while clarifying that it would not use actual "tithing funds." App.V1.92-95; *Huntsman*, 127 F.4th at 790-91.

B. **Whistleblowers and Other Litigation**

In December 2019, a self-proclaimed "whistleblower"—a former Ensign Peak employee—submitted a letter to the IRS (IRS Letter) "regarding Ensign and its role in Church finance." Add.7-8. The whistleblower's brother promptly made the allegations public online. *See* App.V1.68 n.6. The whistleblower claimed that Ensign Peak underreported the value of its assets and improperly directed tithing funds toward supposedly non-religious commercial ventures, including the City Creek project. *See* App.V1.94-95. The IRS, however, "evidently found nothing of interest in the Whistleblower Report" and thus took no action. Br.23.

That did not stop a "deluge of local and national reporting" on the IRS Letter—especially between December 2019 and February 2020, when outlets like the Wall Street Journal, the Washington Post, Forbes, Fox News, CNN, the Salt Lake

Tribune, and Deseret News extensively reported on the subject.  App.V2.397-99.  In response to that coverage, the Church publicly reiterated what it had consistently told its members:  that it set aside and managed a portion of its income "[o]ver many years" to "build[] … a prudent reserve for the future," in keeping with "sound doctrinal and financial principle[s] taught by the Savior … and lived by the Church and its members."  The Church of Jesus Christ of Latter-day Saints, *First Presidency Statement on Church Finances* (Dec. 17, 2019), perma.cc/69FT-8LF5 (cited at App.V1.64).  The Church added that "[a]ll Church funds exist for no other reason than to support the Church's divinely appointed mission" and that "[t]he Church complies with all applicable law governing donations, investments, taxes, and reserves."  *Id.*

Nonetheless, several disaffected former Church members promptly initiated a spate of lawsuits based on the allegations in the IRS Letter and related media coverage.  In February 2020, in *Cook v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, three former Church members cited a December 2019 Washington Post article regarding the IRS Letter and alleged that "the Church has amassed billions of dollars in savings and investment portfolios," which purportedly "prove[d] that tithing and offerings are not being used as the Church claims to its members."  Compl. ¶¶14, 69, No. 20-cv-80 (D. Utah filed Feb. 10, 2020), Dkt.1.  Ultimately, the *Cook* plaintiffs dismissed their claims.  *See Cook*, Dkt.17.

In another case—the *Gaddy* case—a former Church member brought a putative class action against the Church alleging, among other things, that the Church had engaged in fraud and violated the Utah Charitable Solicitation Act. *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, 665 F.Supp.3d 1263, 1273 (D. Utah 2023). Although the *Gaddy* plaintiff originally filed her complaint before the IRS Letter, she quickly amended in light of the IRS Letter. *See* [Proposed] Amended Class Action Compl. ¶5, *Gaddy*, 665 F.Supp.3d 1263 (No. 19-cv-554), Dkt.32-1. The district court dismissed all claims with prejudice, either for failure to state a claim or because the First Amendment's church autonomy doctrine prohibited adjudication. *See Gaddy*, 665 F.Supp.3d at 1273. Last month, this Court affirmed the district court's judgment. *See Gaddy*, 148 F.4th 1202.

Finally, in *Huntsman*, a former Church member in March 2021 filed a self-styled "complaint for fraud" against the Church, which asserted that he "discovered the … fraud" "[i]n December 2019" because of the "IRS whistleblower complaint." Compl. ¶27, No. 21-cv-2504 (C.D. Cal. filed Mar. 22, 2021), Dkt.1. Among other things, the *Huntsman* plaintiff claimed that the Church committed fraud by using "tithing funds" to finance the City Creek project and by supposedly making contrary representations to members. *See id.* ¶3. The district court ruled for the Church, holding that no reasonable juror could conclude that the Church misrepresented the source of the funds used for the City Creek project. *See Huntsman*, 2021 WL

4296208 (C.D. Cal. Sept. 10, 2021). A divided Ninth Circuit panel reversed that decision in August 2023. *See Huntsman*, 76 F.4th at 962. The Ninth Circuit granted rehearing en banc and an 11-judge panel unanimously reaffirmed the district court's conclusion that "[n]o reasonable juror could conclude that the Church misrepresented the source of funds for the City Creek project." *Huntsman*, 127 F.4th at 790. Five judges wrote separately to underscore that the church autonomy doctrine independently foreclosed the lawsuit. *See id.* at 792 (Bress, J., concurring); *id.* at 800 (Bumatay, J., concurring).

Two years after the filing of the last of these lawsuits, the Church resolved administrative proceedings with the Securities and Exchange Commission (SEC). In February 2023, the SEC issued an order initiating cease-and-desist proceedings against the Church and Ensign Peak, on the theory that Ensign Peak had filed certain securities forms incorrectly. *See* App.V1.64, 88-89; *see also* SEC Release No. 96951, 2023 WL 2160756, at *7 (Feb. 21, 2023) (SEC Order). That same month, the proceedings culminated in a settlement in which neither the Church nor Ensign Peak admitted to any legal violations. *See* Add.10; SEC Order, 2023 WL 2160756, at *1.

## C. This Belated Lawsuit

In October 2023—nearly four years after the December 2019 publication of the IRS Letter and the raft of media coverage that followed, but shortly after the

short-lived panel decision in *Huntsman*—the first three named Plaintiffs here filed a putative-class-action complaint against the Church and Ensign Peak in the District of Utah. *See* App.V2.388. Between December 2023 and January 2024, the remaining six named Plaintiffs filed substantially similar complaints in other districts. *See* App.V2.388. All nine named Plaintiffs are current or former Church members who once believed in the scriptural mandate to give tithes. *See* App.V1.57, 65-67, 211 n.7.

In April 2024, the Judicial Panel on Multidistrict Litigation consolidated all those suits in the District of Utah, as they all "involve[d] common questions of fact relating to statements made by the Church regarding its investment and use of tithing funds, the manner in which tithes have been invested, and the purposes for which they have been spent." App.V1.57. Following consolidation, the district court ordered Plaintiffs to file a consolidated complaint, which they did in July 2024. *See* App.V1.60; App.V2.388. That consolidated complaint cites the December 2019 IRS Letter over 20 times, along with associated media coverage from February 2020, and alleges—based on the IRS Letter—that the Church "solicit[ed] donations by representing that donated funds would be used to fund charitable work" but "intentionally conceal[ed]" that Ensign Peak invested and managed a portion of donated funds. App.V1.61-62. Plaintiffs also allege—again based on the IRS Letter—that, despite the Church's supposed "representations to the contrary," the

Church used "tithing funds" to finance so-called "business projects" like City Creek. App.V1.92-93. Plaintiffs claim that they "reasonably relied" on the Church's representations and "would not have donated money, or would have donated less," had they known the "truth." App.V1.70, 107. Plaintiffs further assert that they "had no reason to ever suspect" that donated funds would "be used in manners antithetical to the purported mission of LDS and Ensign." App.V1.98.

Based on such allegations, Plaintiffs asserted five causes of action: (1) breach of fiduciary duty, (2) fraudulent inducement, (3) fraudulent concealment, (4) fraudulent misrepresentation, and (5) unjust enrichment. *See* App.V1.102-09. Plaintiffs' lengthy list of requested relief includes court certification of the proposed class, "an order requiring regular public accounting by [the Church] as to the collection, use and disposition of collected funds and interest and income earned from these funds," and "the appointment of a Special Master or an equally authorized panel of neutrals to monitor the collection, use and disposition of collected funds and income earned from these funds." App.V1.109-10.

The Church and Ensign Peak moved to dismiss Plaintiffs' complaint on three independent grounds: (1) it is barred by the church autonomy doctrine; (2) it fails to state a claim on the merits; and (3) it is time-barred by Utah's three-year statute of limitations for fraud-related claims. *See* App.V1.112-200. They also separately moved to strike Plaintiffs' class allegations. *See* App.V1.201-28.

After a lengthy hearing, the district court in April 2025 dismissed Plaintiffs'
complaint with prejudice (and denied the motion to strike as moot).  *See* Add.1;
V2.App.422.   At the outset, the court recognized that the Church had raised
"significant" and "weighty" questions under the church autonomy doctrine.  Add.15,
40 n.226, 41 n.229.  Invoking the doctrine of constitutional avoidance, however, the
court dismissed the complaint on non-constitutional grounds.  In particular, the court
found Plaintiffs' claims time-barred, reasoning that the publication of the IRS Letter
in December 2019 and the ensuing "deluge" of media attention (including two
articles from February 2020 that Plaintiffs cited in their complaint) placed Plaintiffs
at least on constructive notice of their claims no later than early 2020, rendering their
late 2023 and early 2024 complaints untimely.  *See* Add.16-30.

In the alternative, the district court held that Plaintiffs failed to state any claim
on the merits.  Plaintiffs' claim for breach of fiduciary duty fell short, the court
reasoned, because Plaintiffs' proffered basis for the existence of a fiduciary
relationship between the Church and Plaintiffs—the Utah Charitable Solicitation
Act—did not create a fiduciary relationship.  *See* Add.31-34.  The court rejected
Plaintiffs' fraudulent-inducement and fraudulent-misrepresentation claims because
Plaintiffs failed to adequately plead "reliance" on any allegedly false representations
or any of the "essential facts" for which Rule 9(b) demands particularity.  Add.35-
39.  The court found that the fraudulent-concealment claim could not survive

because Plaintiffs failed to plead that an objectively reasonable person in Plaintiffs' position would find the nondisclosed information "material." Add.39-41. Finally, because Plaintiffs premised their unjust-enrichment claim on their fraud allegations, that claim failed too. Add.42-43.

## SUMMARY OF ARGUMENT

The district court correctly concluded that Plaintiffs' complaint is both untimely and meritless. This Court can follow its lead in applying principles of constitutional avoidance and affirm in full on those non-constitutional grounds. But this entire lawsuit between the Church and its former and current members—which intrudes deeply on internal Church matters, demands the judicial parsing of statements by Church leaders, and openly invites the appointment of a special master to oversee the receipt and disbursement of tithing funds—runs afoul of the First Amendment's church autonomy doctrine. All roads thus point in the same direction: This late-filed lawsuit should come to an early end.

Plaintiffs' claims are untimely under Utah's three-year statute of limitations for fraud-related claims that all agree applies here. That limitations period is triggered by the "discovery" of the alleged fraud, and Utah has determined that constructive knowledge suffices. Thus, the question here is when Plaintiffs could have learned some underlying facts regarding the fraud that the Church allegedly committed. That answer is not debatable: by early 2020 (at the latest). That is

because Plaintiffs' claims are premised on the IRS Letter made publicly available in December 2019, which received heavy national media attention between that time and February 2020. The upshot is that the limitations period closed in early 2023 (at the latest), long before these lawsuits were filed in the wake of the *Huntsman* panel opinion. Plaintiffs' contrary view rests on their misinterpretations of case law and a misreading of the decision below.

Timeliness aside, Plaintiffs fail to state any plausible claims. They barely dispute the district court's determinations that their allegations of fraudulent misrepresentation, fraudulent inducement, and fraudulent concealment cannot survive under Rule 12(b)(6), let alone Rule 9(b). Nor do Plaintiffs contend that their unjust-enrichment claim can proceed if the fraud claims are eliminated. Instead, they briefly ask the Court for leave to replead. But Plaintiffs fail to explain why a new complaint would make any difference here, and regardless, each of those four claims has defects above and beyond the ones that proved fatal below. Nor does Plaintiffs' breach-of-fiduciary-duty claim fare any better, as that claim would require this Court to break new ground and hold that the Utah Charitable Solicitation Act establishes a fiduciary relationship between charities and donors—a proposition that no court has ever accepted, presumably because it has no grounding in the statutory text and defies longstanding common-law principles.

Finally, no amount of repleading can shake the fundamental First Amendment problem with this whole enterprise. A suit by adherents against their own current or former church for a tithing refund is barred by the church autonomy doctrine. Everything about this lawsuit runs afoul of that doctrine. It asks a secular court to parse statements made by the head of a church to its members and to appoint a secular special master to run church affairs. If this suit were allowed to proceed, it would be the first of many. Every church has adherents that fall away, and many of those former believers may regret their years of tithing and wish for a refund. And every church has current adherents who would prefer that church resources be redirected to other purposes. None of that is the business of secular courts. Both this Court and the en banc Ninth Circuit have rejected timely efforts to convert such disagreements into fraud claims. This untimely effort should suffer the same fate.

## ARGUMENT

### I. The District Court Correctly Concluded That Plaintiffs' Claims Are Time-Barred.

The "general purpose" of a statute of limitations is "to protect defendants against stale or unduly delayed claims." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012). As the district court correctly recognized, Plaintiffs delayed too long in bringing their claims here. *See* Add.16-30. Plaintiffs' effort to resist that conclusion is unavailing.

## A. No Plaintiff Filed a Complaint Within the Three-Year Limitations Period.

It is undisputed that the timeliness of all of Plaintiffs' claims—which are against Utah defendants and premised on statements made in Utah—is governed by Utah's statute of limitations for fraud-based claims. *See* Br.12; App.V1.153-54. That statute provides that "[a]n action may be brought within three years … for relief on the ground of fraud or mistake; except that the cause of action does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake," Utah Code Ann. §78B-2-305(3). The statute thus sets forth a three-year limitations period, which begins running upon the plaintiff's "discovery" of the alleged fraud.

As a general rule across jurisdictions, "the word 'discovery,' when used in a statute of limitations without qualification, 'encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known.'" *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 185 (2020). Utah is no exception. As the Utah Supreme Court has long made clear, a plaintiff is deemed to have discovered his fraud action when he has actual knowledge of the fraud "or by reasonable diligence and inquiry should know[] the relevant facts of the fraud perpetrated against him"—*i.e.*, when he has constructive knowledge. *Baldwin v. Burton*, 850 P.2d 1188, 1196 (Utah 1993); *see Russell Packard Dev., Inc. v. Carson*, 108 P.3d 741, 746 (Utah 2005); *Taylor v. Moore*, 51 P.2d 222, 229 (Utah 1935).

The Utah Supreme Court has "particularly emphasized the importance of the diligence requirement" that informs the constructive-knowledge standard. *Colosimo v. Roman Cath. Bishop of Salt Lake City*, 156 P.3d 806, 811 (Utah 2007). As that court has explained, "[a] party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge." *Baldwin*, 850 P.2d at 1196. Instead, "[t]he means of knowledge is equivalent to knowledge" itself. *Id.* at 1196; *see, e.g.*, *Donner v. Nicklaus*, 197 F.Supp.3d 1314, 1325 (D. Utah 2016), *aff'd*, 700 F.App'x 877 (10th Cir. 2017). And it is "not necessary for a claimant to know every fact about his fraud claim before the statute begins to run." *Baldwin*, 850 P.2d at 1197. Rather, the "limitations period will run" as long as "some underlying facts" are discoverable. *Colosimo*, 156 P.3d at 811.

This well-settled law is fatal to Plaintiffs' effort to belatedly recover for allegations broadly publicized in late 2019 and early 2020. As this Court has highlighted, "[a] statute of limitations defense 'may be appropriately resolved on a Rule 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished.'" *Sierra Club v. Oklahoma Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016) (brackets omitted). Other courts of appeals agree. *See, e.g.*, *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013); *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989);

*Wilburn v. Pepsi-Cola Bottling Co. of St. Louis*, 492 F.2d 1288, 1289 (8th Cir. 1974) (per curiam); *White v. Padgett*, 475 F.2d 79, 82 (5th Cir. 1973); *Kincheloe v. Farmer*, 214 F.2d 604, 605 (7th Cir. 1954). And Utah courts have adopted a similar approach. *See, e.g.*, *Muir v. Wasatch Front Waste & Recycling Dist.*, 547 P.3d 863, 868-69 (Utah Ct. App. 2024).

Applying these principles, the district court's conclusion that Plaintiffs' claims are time-barred under Utah's three-year statute-of-limitations is unassailable. Plaintiffs filed the first of their complaints in October 2023, *see* Add.11, not long after a Ninth Circuit panel had suggested that a claim filed in March 2021 based on the same underlying whistleblower complaint could proceed. Thus, the relevant question is whether Plaintiffs had an "opportunity" to discover "some underlying facts" "constituting the alleged fraud"—even if not "every fact"—before October 2020. *Colosimo*, 156 P.3d at 811 & n.19. The answer is plainly yes, and Plaintiffs' own complaint confirms as much.

To begin, and as the district court recognized, the IRS Letter "is clearly 'the genesis' of Plaintiffs' Consolidated Complaint and the factual basis of many of Plaintiffs' allegations." Add.19. In fact, Plaintiffs' own complaint cites the IRS Letter over 20 times and invokes it as support for nearly every purportedly material allegation regarding the Church's supposed fraud. That includes allegations regarding the corporate relationship between the Church's for- and non-profit

entities, Ensign Peak's purported hoarding of donated funds, its purportedly secretive management practices, the supposedly deliberate undervaluation of its assets on its tax forms, its alleged failure to make distributions for tax-exempt charitable or religious purposes, and its supposed use of donations to fund the City Creek project. *See* App.V1.67, 82-93.

There is no question that Plaintiffs could have discovered those facts well before October 2020. After all, the IRS Letter is a publicly accessible document originally made available in December 2019, *see* App.V1.58 n.6; Add.19-20, and it immediately resulted in "a deluge of local and national reporting" that no reasonably diligent person attuned to Church matters could have missed, Add.20. Plaintiffs themselves cite two such articles in their complaint—a (1) February 8, 2020 Wall Street Journal article titled *The Mormon Church Amassed $100 Billion, It Was the Best-Kept Secret in the Investment World* and (2) a February 8, 2020 Salt Lake Tribune article titled *LDS Church Kept the Lid on Its $100B Fund for Fear Tithing Receipts Would Fall, Account Boss Tells Wall Street Journal*. *See* App.V1.91 nn.46-47. Those articles were just the tip of the iceberg, as numerous other media outlets nationwide—including national outlets like the Washington Post, ABC News, Fox News, CNN, and Forbes, and local outlets like Deseret News, KUTV News, and the Salt Lake Tribune—published article after article about the IRS Letter between December 2019 and February 2020 too. *See* Add.19-22. Given all of this, it "strains

credulity" that Plaintiffs—who have a "self-described" acute interest in Church financial matters—"could not, with reasonable diligence," have "learn[ed]" some facts about the Church's alleged fraud by February 2020 at the very latest, which means the limitations period closed by February 2023. *Grynberg v. Total S.A.*, 538 F.3d 1336, 1349 (10th Cir. 2008).

That conclusion is underscored by the reality that multiple *other* similarly situated plaintiffs *did* file lawsuits within that limitations period. In the *Cook* case, for example, the plaintiffs filed suit in February 2020 and highlighted the IRS Letter en route to alleging that "the Church has amassed billions of dollars in savings and investment portfolios, which further prove[] that tithing and offerings are not being used as the Church claims to its members." Compl. ¶¶14, 69, *Cook*, No. 20-cv-80 (D. Utah filed Feb. 10, 2020), Dkt.1. Similarly, in March 2020, the plaintiff in *Gaddy* submitted a proposed amended complaint that cited the "IRS whistleblower complaint" from "late 2019" in support of her fraud claims against the Church. [Proposed] Amended Class Action Compl. ¶5, No. 19-cv-554 (D. Utah filed Mar. 30, 2020), Dkt.32-1. And in March 2021, in *Huntsman*, the plaintiff filed a "complaint for fraud" and asserted that he "discovered the … fraud" "[i]n December 2019" because of the "IRS whistleblower complaint." Compl. ¶27, No. 21-cv-2504 (C.D. Cal. filed Mar. 22, 2021), Dkt.1.

As all of this underscores, the dates on the face of Plaintiffs' complaint (and other materials subject to judicial notice) make crystal clear that Plaintiffs had an opportunity to discover some (if not all) of the facts undergirding the alleged fraud no later than early 2020. *See Baldwin*, 850 P.2d at 1196-97. Instead, the Plaintiffs waited over three years and were stirred to action only after the short-lived *Huntsman* panel decision. The district court did not err in holding those belated claims time-barred. *See* Add.30

## B. Plaintiffs' Contrary Arguments Are Unpersuasive.

Plaintiffs' contrary arguments are uniformly meritless. Plaintiffs first contend that the district court had no authority to resolve the statute-of-limitations question at the pleading stage at all, suggesting that "accrual is a question of fact for the jury" and that "the district court improperly decided a factual question" at the pleading stage "that should have been developed in discovery and left for the jury to decide." Br.14. That sweeping position is flatly incorrect. To be sure, statute-of-limitations questions are "often … difficult" and may involve fact questions for a jury. *Russell Packard*, 108 P.3d at 746. But "often" does not mean "always." That explains why successful motions to dismiss on timeliness grounds are far from the null set and why all the authorities cited in Plaintiffs' submission acknowledge that plaintiffs can plead themselves out of court on limitations grounds. *See Bistline v. Parker*, 918 F.3d 849, 881 (10th Cir. 2019); *Berenda v. Langford*, 914 P.2d 45, 54 (Utah 1996);

*Shiozawa v. Duke*, 344 P.3d 1174, 1180 (Utah App. 2018). As the district court stated, "[s]uch is the case here." Add.29.

In resisting that conclusion, Plaintiffs assert that "[t]he district court erred in basing its decision on Colorado law related to 'sophisticated investors.'" Br.14. In other words, Plaintiffs fault the court below for finding persuasive value in this Court's decision in *Grynberg v. Total S.A.*, 538 F.3d 1336, which found a complaint filed by a "sophisticated" businessman time-barred—without sending the matter to a jury—because the plaintiff could have "learn[ed]" the facts undergirding his claim in a timely manner "simply" by reading "leading business newspapers circulated in this country." *Id.* at 1349. Plaintiffs' argument suffers from at least two fatal flaws.

First, while *Grynberg* applied Colorado law, the relevant principle was hardly some idiosyncratic doctrine, but rather the familiar principle that the statute of limitations begins to run when the plaintiff "knew or should have known that it could bring claims against the defendants." *Id*. at 1347. The Utah standard is no different. *See Russell Packard*, 108 P.3d at 746 ("[T]he statute of limitations … begin[s] running from the date a plaintiff either discovered or should have discovered his or her claim."). That *Grynberg* involved Colorado law is a distinction without a difference.

Second, although *Grynberg* emphasized that the plaintiff was a "sophisticated" businessman who would have followed the leading business

newspapers, this Court went out of its way to emphasize that sophisticated businessmen are *not* the only ones charged with constructive knowledge when facts relating to their claims are widely covered in the media. As the Court recounted, "more generally, several of our sister circuits have held that where events receive widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *Grynberg*, 538 F.3d at 1349 (alterations and quotation marks omitted); *see, e.g.*, *Patterson v. United States*, 451 F.3d 268, 271 (1st Cir. 2006) (affirming dismissal of complaint because "[t]he record demonstrates beyond serious dispute that the breaking news of the FBI's involvement in the Deegan murder did receive … widespread publicity" and thus the plaintiff "should have learned of the news at that time"); *In re Briscoe,* 448 F.3d 201, 223-24 (3d. Cir. 2006) ("The extensive publicity and notice campaigns provide adequate support … for the District Court's finding that petitioners had the requisite 'reasonable opportunity' to discover their doctors' alleged torts."); *Hughes v. Vanderbilt Univ.,* 215 F.3d 543, 548 (6th Cir. 2000) ("Based on the undisputed facts concerning the media attention given to the Vanderbilt study in question, no reasonable factfinder could find that Hughes's cause of action accrued any later than January 19, 1995."); *Fulcher v. United States,* 696 F.2d 1073, 1077 (4th Cir. 1982) ("A prudent landowner exercising reasonable diligence should, as a matter of law, have discovered the government's open and notorious occupation of the land by the fall of 1964" given the "extensive

publicity[.]"); *United Klans of Am. v. McGovern*, 621 F.2d 152, 154-5 (5th Cir. 1980) (per curiam) ("We conclude that the Klan should have known of its potential claim against the FBI before August 26, 1976," in part because of the "widespread publicity" of the facts underlying the claim.).

Moreover, Plaintiffs may not be sophisticated businesspeople, but this is not a business tort or securities action. It is a case involving alleged fraud by the Church of which Plaintiffs were members and to which they had tithed for many years. Under those circumstances, when a major story about the Church and its finances broke and was widely reported, Plaintiffs could be charged with constructive knowledge of those much-discussed matters, no less than a sophisticated businessperson.

Undeterred, Plaintiffs insist that "the district court's neglect of Utah law and cases involving ordinary people warrants reversal." Br.16. In reality, the court below explicitly addressed both Utah cases that Plaintiffs discuss, and neither helps them. Indeed, Plaintiffs themselves concede that the first of those cases—*Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019)—involved "unique facts." Br.16. That is an understatement. As this Court emphasized in *Bistline*, the case involved "incredibly unique and extreme factual circumstances," with plaintiffs from the Warren Jeffs-led Fundamentalist Church of Jesus Christ of Latter-Day Saints who "were subjected to intensive indoctrination and seclusion that plausibly prevented them from

identifying the wrongful nature of defendants' conduct." 918 F.3d at 883-84. In other words, the *Bistline* Court addressed a statute-of-limitations question in the context of an "egregious version of indoctrination, with many plaintiffs being born and raised completely within this community, their education being provided in most cases solely through the community, and their interactions with anything outside the community intentionally and severely restricted." *Id.* Because of those "unusual circumstances," this Court could "[]not say as a matter of law that plaintiffs should have suspected defendants of wrongdoing" more than three years before they filed suit. *Id.* at 881. As the district court pointed out, "Plaintiffs' Consolidated Complaint is devoid of any comparable allegations and, by implication, any similar questions of fact." Add.28.

Plaintiffs' other Utah case—*Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024 (D. Utah May 17, 2018)—is no more helpful. Plaintiffs suggest that *Thompson* supports the proposition that "courts have declined to impute publicly available information to plaintiffs for statute of limitations purposes." Br.16. In fact, *Thompson* confirmed the generally accepted principle (referenced in *Grynberg* and elsewhere) that "[p]ublicly available documents"—like "widely disseminated … news reports"—"may be sufficient to charge a plaintiff with constructive knowledge." 2018 WL 2271024, at *13. Citing an example, the *Thompson* court indicated that it is fair to impute constructive knowledge to antitrust plaintiffs when

"national media" have "reported the alleged antitrust conspiracy." *Id.* (citing *In re Nine W. Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 193 (S.D.N.Y. 2000)). The *Thompson* court merely found that the particular antitrust plaintiffs before it did not have "any reasonable basis to begin investigating their antitrust claims" based solely on "settlement agreements" and other information that the media did *not* widely discuss. *Id.* That bottom-line holding has no bearing here. Plaintiffs had constructive knowledge based on the IRS Letter itself and a veritable deluge of media reporting about it between December 2019 and February 2020, and no one is arguing that court documents alone triggered the statute of limitations.[1]

Plaintiffs thus shift to asserting that the district court should not have considered any of the media attention in the first place. *See* Br.18-19. That argument is a dead-end. As noted, Plaintiffs' own complaint cited some of that media coverage in furtherance of their own allegations, and it is well within the purview of district courts to consider those materials under such circumstances. *See, e.g.*, *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008). Furthermore, as the district court explained regarding the other media coverage, "Plaintiffs raised no objection at the

---

[1] Plaintiffs thus miss the point in resisting the notion that the complaints in *Cook*, *Gaddy*, and *Huntsman* placed them on constructive notice. *See* Br.22. The point is not that those suits put Plaintiffs on notice, but that those suits illustrate that similarly situated plaintiffs were on notice of their claims from the same sources that should have put Plaintiffs on notice.

January 17, 2025 motion hearing to the court taking judicial notice of the '26 separate media accounts about the whistleblower report between December 2019 and February 2020 … in no fewer than 20 media outlets, including The Washington Post, the Salt Lake Tribune[,] … Forbes, CNN, [and] Bloomberg.'" Add.29-30. That silence was no blunder but reflects the reality that courts may "take judicial notice of documents sua sponte as long as the documents have 'a direct relation to matters at issue,'" which they do here. *White v. Lucero*, 135 F.4th 1213, 1219 (10th Cir. 2025). Plaintiffs' argument thus is not merely forfeited; it is substantively flawed to boot.

The problems with Plaintiffs' arguments do not end there. They insist that the district court improperly accepted the "veracity" of the "opinions and assertions" in the news reports. Br.18. In fact, the court did the opposite. As it explained in no uncertain terms: "Taking judicial notice of these articles is proper because their publication is not subject to reasonable dispute and because *the court considers them not for their truth* but only as evidence of the information in the public realm shortly following the release of the Whistleblower Report." Add.21 n.127 (emphasis added).

Plaintiffs describe the media coverage as "largely local" to the "Salt Lake" area. Br.19. Setting aside that one Plaintiff is a Utah resident and that all Plaintiffs constructed a consolidated complaint premised on the concept that they closely

followed events in Salt Lake City where the Church is headquartered, Plaintiffs ultimately acknowledge (as they must) that "less parochial" outlets like the Wall Street Journal and Washington Post reported on the IRS Letter too. Br.20. And while Plaintiffs protest that the media "typically did not independently substantiate any of the whistleblower's assertions," Br.20, that is beside the point. "[A]ll that is required to trigger the statute of limitations is sufficient information to put plaintiffs on notice to make further inquiry if they harbor doubts or questions." *Macris v. Sculptured Software, Inc.*, 24 P.3d 984, 990 (Utah 2001).

Plaintiffs protest that the Church gave "public denials" in the wake of the IRS Letter and that, for all they knew at the time, a "crackpot" may have authored the IRS Letter. Br.20-21. But all that is just another way of saying that, by early 2020, Plaintiffs did not have *all* the relevant facts at their fingertips. That is a dubious proposition, but regardless, that is not the standard. "[I]t is not necessary for a claimant to know every fact about his fraud claim before the statute begins to run." *Baldwin*, 850 P.2d at 1197. Rather, "if a party has knowledge of *some* underlying facts, then that party must reasonably investigate potential causes of action because the limitations period will run." *Colosimo*, 156 P.3d at 811 (emphasis added). Plaintiffs obviously failed to comply with that standard.

With nothing else to offer, Plaintiffs implore the Court for leave to amend their complaint to include allegations that "they had not seen or heard of the 2019

Whistleblower Report or the news articles gathered by Appellees and considered by the Court at the time of their publication." Br.24. Plaintiffs suggest that, if granted leave to amend, they would reintroduce allegations that "it was only after the SEC issued its Order [in February 2023]—and the subsequent national coverage of that Order on 60 Minutes—that they first learned about the 'facts constituting the fraud.'" Br.24-25. Such allegations might strain credulity, but they would not assist Plaintiffs. The statute of limitations begins to run when they had "actual *or constructive knowledge* of the relevant facts forming the basis of the cause of action." *Russell Packard*, 108 P.3d at 746 (emphasis added). Alleging that the Plaintiffs did not, in fact, know what they plainly should have known is irrelevant. Moreover, it bears emphasizing that, even after the February 2023 SEC Order, Plaintiffs waited over another half-year to file suit and then cited the SEC Order just three times, compared to the 20 references to the 2019 IRS Letter. *See* pp.21-22, *supra*. What really seems to have precipitated these suits is not the February 2023 SEC Order, but the August 2023 panel decision in *Huntsman*, in which the Ninth Circuit gave a (temporary and subsequently vacated) green light for suits like these. But while that decision may explain the timing of these suits, it ultimately reinforces their untimeliness. Huntsman, like Gaddy and Cook, filed suit based on the same

underlying facts years before this belated effort. The district court was entirely correct to dismiss Plaintiffs' last-filed action as untimely.[2]

## II. The District Court Correctly Concluded That Plaintiffs Failed to Adequately Plead Their Claims.

If Plaintiffs' effort to dispute the district court's statute-of-limitations holding is unpersuasive, their effort to dispute its independently sufficient merits holding is virtually nonexistent. Plaintiffs barely mention the district court's conclusions that their allegations are inadequate, *see* Add.31-43, and the very few arguments that they do advance fall far short of demonstrating reversible error.

### A. Fraudulent Misrepresentation & Fraudulent Inducement.

Plaintiffs' allegations of fraudulent misrepresentation and fraudulent inducement are insufficient, and the question is not close. Both of those claims require a plaintiff to allege the same nine elements:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in

---

[2] Plaintiffs suggest that the district court needed to provide a precise date when the claims accrued and that this purported oversight creates "uncertainty." Br.25-26. But there is no uncertainty that "early 2020" is more than three years before "late 2023," which is all that matters. *See also, e.g.*, *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (10th Cir. 2014) (accrual began in "fall of 2005"); *In re Briscoe*, 448 F.3d at 207, 222 (referring to accrual range); *Patterson*, 451 F.3d at 271 (same).

33

fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Webster v. JP Morgan Chase Bank, NA*, 290 P.3d 930, 936 (Utah App. 2012); *see also Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991). Moreover, because fraudulent-inducement and fraudulent-misrepresentation claims are obviously "alleging fraud," the heightened pleading requirements of Rule 9(b) apply, which require the plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). That means that the plaintiff must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof," *Gaddy*, 148 F.4th at 1210, including the plaintiff's "reliance" on the allegedly false statement, *Parrish v. Arvest Bank*, 717 F.App'x 756, 761-62 (10th Cir. 2017).

The district court determined that Plaintiffs failed to adequately plead the reliance element of their fraudulent-misrepresentation and fraudulent-inducement claims. *See* Add.35-39. In reality, Plaintiffs did nothing more than generically allege that they "reasonably relied" on and "reasonably believed" the Church's representations regarding the use of donated funds. App.V1.70, 96-98, 105, 107. Such "conclusory allegations" do not satisfy even the minimum requirements demanded by Rule 12(b)(6), *see McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1130 (10th Cir. 2024), much less the more demanding requirements of Rule 9(b), *see* Add.36. Indeed, Plaintiffs' reliance allegations here are indistinguishable

from the reliance allegations that this Court just found wanting in *Gaddy*. *See* 148 F.4th at 1219-20 ("Plaintiffs do not allege sufficient facts to plausibly plead their reliance. Plaintiffs merely allege that they 'relied on the [Church's] representations as to how their tithing is used' in making continued tithing payments.").

Plaintiffs offer literally no argument that the court erred in rejecting these two fraud claims but simply request leave to replead in a single sentence: "Appellants should be afforded the opportunity to amend to provide more specific allegations about, for example, the specific representations made by Appellants that each relied on and the nature of donations they made." Br.30. That fleeting request does not get the job done. This Court has "routinely … declined to consider arguments that … are inadequately presented[] in an appellant's opening brief," *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007), and there is no basis to depart from that practice here. Plaintiffs "do[] not explain" with any specificity "what additional facts [they] would allege or how [they] would otherwise revise [their] complaint." *Brody v. Bruner ex rel. Bruner Fam. Tr.*, 2024 WL 1912555, at *8 (10th Cir. May 1, 2024); *see id.* at *8 n.12. Plaintiffs thus offer no reason to believe that amending the complaint is anything other than a "futile" exercise. *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014). And it is too late to compensate for that deficiency on reply. *See Gaddy*, 148 F.4th at 1209-10; *Cahill v. Am. Fam. Mut. Ins. Co.*, 610 F.3d 1235, 1239 (10th Cir. 2010).

Denying leave to replead is all the more appropriate because Plaintiffs' fraudulent-misrepresentation and fraudulent-inducement claims are infected with other incurable defects. Most obviously, those claims both require the existence of "false" statements, *see Webster*, 290 P.3d at 936; *Crookston*, 817 P.2d at 800, which are glaringly absent here. The fraudulent-misrepresentation claim, for example, rests on the assertion that the Church "made false statements of material fact that tithing funds … would not be used for the financing of City Creek Center." App.V1.107. But that is the very claim that the en banc Ninth Circuit just *rejected* in *Huntsman*. *See* 127 F.4th at 790 ("No reasonable juror could conclude that the Church misrepresented the source of funds for the City Creek project."). The Church and Ensign Peak pressed this argument below. *See* App.V1.146-47, App.V2.335-36. This Court thus is free to affirm on that basis too. *See Feinberg v. Comm'r*, 916 F.3d 1330, 1334 (10th Cir. 2019) ("This court has 'discretion to affirm on any ground adequately supported by the record.'").

Plaintiffs' fraudulent-inducement claim has other shortcomings. That claim springs from four allegedly false statements made by the Church: that (1) "donated funds would be directed towards charitable purposes"; (2) "funds donated to specific church organizations would be directed toward those organizations and used exclusively for charitable purposes"; (3) "the 'vast majority' of donated funds would be used for charitable purposes"; and (4) "[the Church] followed all applicable laws

36

regarding its use of donated funds." App.V1.104.  None of those statements is false.  As to the first three statements, Plaintiffs' theory of falsity is premised on the notion that, because the Church chose to initially invest some donated funds with Ensign Peak, it necessarily forswore a "charitable" use for them.  App.V1.63.  That is nonsensical.  Just because the Church did not "immediately" expend all donated funds for charitable purposes does not mean that it will *never* use them in that way.  *See Stone*, 356 P.2d at 634.  If someone says that she will direct her earnings toward a down payment on a house and then proceeds to deposit the money in a bank savings account, no one would accuse her of having made a false statement.  The same logic applies here.[3]

As to the fourth statement, Plaintiffs never advanced any allegations that the Church failed to follow all applicable laws.  In fact, Plaintiffs themselves acknowledge that "the IRS evidently found nothing of interest" after receiving the IRS Letter.  Br.23.  And the SEC Order produced a settlement involving no admission of illegality by the Church or Ensign Peak.  *See* Add.10.  Thus, while the fraudulent-misrepresentation and fraudulent-inducement claims cannot proceed

---

[3] Furthermore, since 2012, the Church's donation slips have explicitly stated that "all donations become the Church's property and will be used at the Church's sole discretion to further the Church's overall mission."  App.V2.383.

because Plaintiffs failed to adequately allege reliance (as identified by the district court), the absence of any false statement dooms those claims too.

## B. Fraudulent Concealment

Plaintiffs' fraudulent-concealment claim is equally unsound. "In order to prevail on a claim of fraudulent concealment, a plaintiff must prove '(1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) that there is a legal duty to communicate.'" *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 286 (Utah 2006). As the district court recognized, Plaintiffs' claim cannot get off the starting block because Plaintiffs failed to adequately plead materiality. *See* Add.40.

Under Utah law, materiality is "objective" and necessitates an assessment of whether a "reasonable person" would find something "importan[t]." *Gilbert Dev. Corp. v. Wardley Corp.*, 246 P.3d 131, 141 (Utah Ct. App. 2010); *see Youngblood v. Auto-Owners Ins. Co.*, 158 P.3d 1088, 1096 (Utah 2007). Plaintiffs made zero effort to comply with that standard here: The complaint says only that the Church "concealed the full extent of its holdings, and also concealed that it was directing funds to Ensign," which then held and invested those funds. App.V1.106. That does not suffice under either Rule 12(b)(6) or Rule 9(b) standards. *See* Add.41-42 & n.231.

Plaintiffs briefly claim that "the district court erred in finding that materiality was not adequately alleged." Br.31. In their view, they "allege[d] that '[the Church and Ensign Peak] knew that [they] would not have donated money, or would have donated less, had they known that the funds would be used for these purposes." Br.31. Of course, that is just another way of saying that, but for the Church's alleged fraudulent conduct, Plaintiffs themselves would have altered their own conduct. But the suggestion that "'materiality' is measured in" "subjective" "'but for' terms" is the very approach to "materiality" that Utah law flatly "reject[s]." *Gilbert*, 246 P.3d at 140.[4]

Unsurprisingly, then, Plaintiffs pivot to a (very brief) argument that they "should be afforded leave to amend to address any deficiencies." Br.30. Once again, however, Plaintiffs do not deign to "explain what additional facts [they] would allege or how [they] would otherwise revise [the] complaint." *Brody*, 2024 WL 1912555, at *8. Plaintiffs' cursory request to replead thus fares no better than the one made for their two other fraud claims. *See also Cahill*, 610 F.3d at 1238 ("We will not construct arguments for [parties] out of isolated sentences in [their] briefs.").

---

[4] Plaintiffs suggest that their materiality allegation is based on a statement from Ensign Peak's CEO. *See* Br.31. That does not alter the reality that Plaintiffs' materiality allegation is a subjective one.

Moreover, giving Plaintiffs a second bite at the materiality apple is particularly unwarranted because they cannot satisfy the third element of their claim anyway—*i.e.*, that the Church had a "duty to disclose" the concealed information to Plaintiffs. The district court expressed "serious doubts" that Plaintiffs had carried their burden on this front, and for good reason: There is no precedent whatsoever suggesting that a church has a duty to publicly disclose the use of its funds (likely because of the First Amendment sensitivities). *See Gaddy*, 665 F.Supp.3d at 1292. Plaintiffs' fraudulent-concealment claim thus is doubly deficient on the merits too.

## C.   Unjust Enrichment

Plaintiffs' attempt to revive their unjust-enrichment claim is even more feeble. To state a claim for unjust enrichment, a plaintiff must plead "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984). Plaintiffs' unjust-enrichment claim here is based on the idea that it is "inequitable" for the Church to retain the donated funds given its purportedly fraudulent "misrepresentations and omissions." App.V1.108. As the district court correctly recognized, the unjust-enrichment claim is entirely dependent on the viability of the fraud claims—and not a single one is viable. *See* Add.43; pp.33-40, *supra*.

Plaintiffs relegate their discussion of their unjust-enrichment claim to a footnote, which does not dispute the district court's conclusion that deficiencies with the fraud claims have a domino effect on the unjust-enrichment claim. *See* Br.30 n.17. Plaintiffs thus appear to wager that this Court will grant them leave to replead their fraud claims. There is no basis to do so for all the reasons provided above, and regardless, the problems with the unjust-enrichment claim run deeper. As the Utah Supreme Court has explained, the premise of an unjust-enrichment claim is that "the enrichment to the defendant must be unjust in that the defendant received … 'something for nothing.'" *Emergency Physicians Integrated Care v. Salt Lake Cnty.,* 167 P.3d 1080, 1086 (Utah 2007). In other words, unjust-enrichment claims contemplate an exchange between two parties. But the *raison d'être* of a donation is that the donor will *not* receive something in return. Plaintiffs' unjust-enrichment claim is thus a complete nonstarter.

### D.     Breach of Fiduciary Duty

Rather than meaningfully grapple with their fraud and unjust-enrichment claims, Plaintiffs devote the bulk of their merits arguments to disputing the district court's rejection of their breach-of-fiduciary-duty claim. Those arguments—while marginally lengthier (three pages)—are equally flawed. To state a claim for breach of fiduciary duty, a plaintiff must allege four elements: (1) "the existence of a fiduciary relationship," (2) "breach of the fiduciary duty," (3) "causation, both actual

and proximate," and (4) "damages." *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 417 P.3d 95, 109-10 (Utah 2018). As the district court correctly concluded, Plaintiffs cannot clear the first hurdle. *See* Add.31-34.

The only basis that Plaintiffs have ever set forth for "the existence of a fiduciary relationship" between the Church and donors is the Utah Charitable Solicitation Act. *See* App.V1.102. In relevant part, that statute provides: "Every person soliciting, collecting, or expending contributions for charitable purposes, and every officer, director, trustee, or employee of any person concerned with the solicitation, collection, or expenditure of those contributions, shall be considered to be a fiduciary and acting in a fiduciary capacity." Utah Code Ann. §13-22-23 (1953). No court has ever interpreted the statute to create a fiduciary relationship between a church and its members (or even a secular donee and donor), and it is easy to see why. As the district court observed, the statutory text "says nothing about donors" whatsoever or their charitable relationships. Add.33.

By contrast, the "most natural … reading of the statutory language," *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993), is simply that it recognizes that a fiduciary duty exists between an agent of a charity and "the charity itself," Add.34. Bedrock common-law principles reinforce that conclusion. As the Restatement of Charitable Nonprofit Organizations explains, "[a] fiduciary of a

charity has a duty to … act in good faith and in a manner the fiduciary reasonably believes to be in the best interests *of the charity* in light of its purposes." §2.02 (Am. L. Inst. 2021) (emphasis added). Furthermore, as the Utah Supreme Court has explained, "[a] 'fiduciary relationship' exists between two parties when one of them 'is required to act for the benefit of [the other] on all matters within the scope of their relationship'"—*e.g.*, a "principal's agent, who is required to act solely for the benefit of the principal in matters connected with the agency." *Orlando Millenia, LC v. United Title Servs. of Utah, Inc.*, 355 P.3d 965, 971 (Utah 2015). If the Utah legislature really meant to suggest, in a stark departure from well-established common-law principles, that an agent of a charitable organization must act solely in the interests of donors—as opposed to solely in the interests of the charity—surely it would have said so more clearly. *See Burton v. Chen*, 532 P.3d 1005, 1012 (Utah 2023) ("[W]e do not presume that a statute was intended to abrogate common law principles unless the Legislature makes that intent clear.").

Plaintiffs offer no persuasive response. They posit that this interpretation makes the relevant statutory text "pointless" because the Restatement of Nonprofit Charitable Organizations already explains that a charity's solicitor owes a fiduciary duty to the charity that she serves. *See* Br.27. That argument is misguided. The Restatement has no independent force in Utah (or elsewhere) unless codified by the state legislature. *Cf. Clark v. Pangan*, 998 P.2d 268, 273 (Utah 2000) ("While the

restatement is sometimes useful in providing guidance, it is not dispositive of Utah law.").  That is why Utah and numerous other states "have indeed adopted Restatement sections as part of their code."  Dru Stevenson, *Costs of Codification*, 2014 U. Ill. L. Rev. 1129, 1140 n.65 (2014).

Plaintiffs also suggest that interpreting the statute to formalize a fiduciary relationship between an agent of a charity and the charity itself would make "surplusage" out of other statutory language:  "Nothing in this chapter precludes any person damaged as a result of a charitable solicitation from maintaining a civil action for damages or injunctive relief."  Utah Code Ann. §13-22-4; *see* Br.27.  No such superfluity exists.  The cited language clarifies that the Charitable Solicitation Act does not preempt independent lawsuits by individual donors under the common law—a critical clarification given the statute's grant of enforcement authority to the state.  *See* Utah Code Ann. §13-22-3(1), 4(a) (1953).

With no textual support, Plaintiffs turn to the Utah Court of Appeals' decision in *Siebach v. Brigham Young University*, 361 P.3d 130 (Utah Ct. App. 2015), which addressed preemption issues.  *See* Br.28.  Plaintiffs emphasize *Siebach*'s statement that the Charitable Solicitation Act "anticipates donors personally seeking damages when their donations are procured by fraud," 361 P.3d at 139-40.  *Siebach* does not advance the ball for Plaintiffs either.  Because the Charitable Solicitation Act does not create a "private right of action," the quoted statement (just like the quoted

statutory text above) just confirms that the statute does not preempt individual fraud claims under the common law.  *See Gaddy*, 665 F.Supp.3d at 1294 (D. Utah 2023) (interpreting *Siebach*).

Plaintiffs then look beyond Utah, emphasizing that California has enacted a law stating that "there exists a fiduciary relationship between a charity or any person soliciting on behalf of a charity, and the person from whom a charitable contribution is being made."  *See* Br.27 n.13 (quoting Cal. Bus. & Prof. Code §17510.8).  That argument affirmatively undermines Plaintiffs' position.  After all, it is powerful evidence that, when a state legislature intends to create counterintuitive and ahistorical fiduciary relationships between donees and donors, it does so explicitly.[5] The Utah legislature has not done so, as treatises have recognized.  *See, e.g.*, 24 Bogert's Law of Trusts and Trustees §481 n.10 (May 2025) (recognizing that the law in California is that "[c]harities and solicitors are fiduciaries of the donors," whereas the law in Utah is that "[a]ll persons soliciting, collecting or expending charitable

---

[5] In a footnote, *see* Br.28 n.15, Plaintiffs reference the Pennsylvania Commonwealth Court's 1993 determination that the Pennsylvania Charitable Solicitation Act creates a "duty" between a charity and "*potential* donors … [i]n the Commonwealth."  *Commonwealth by Preate v. Cancer Fund of Am., Inc.*, 620 A.2d 647 (Pa. Commw. Ct. 1993) (emphasis added).  Plaintiffs are not aware of any case in Pennsylvania or elsewhere that has ever cited that unreasoned language, much less agreed with it.  Nor are Plaintiffs arguing that the Utah Charitable Solicitation Act creates such a duty.

contributions are fiduciaries as to the funds").[6]  Plaintiffs' breach-of-fiduciary-duty

claim thus badly misses the mark.

## III.   The First Amendment Independently Forecloses This Lawsuit.

As the foregoing demonstrates, this Court can follow the district court's lead

and affirm without wading into constitutional waters, as Plaintiffs' claims are both

untimely and meritless.  But the defects with this suit are even more fundamental; it

is antithetical to the First Amendment and is squarely barred by the church autonomy

doctrine.

### A.   The Church Autonomy Doctrine Prohibits Lawsuits Against Churches Unless the Disputes Are Purely Secular.

The First Amendment provides that "Congress shall make no law respecting

an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const.

amend. I.  The Religion Clauses protect the "power" of "religious organizations" to

"decide for themselves, free from state interference, matters of church government

as well as those of faith and doctrine," *Hosanna-Tabor Evangelical Lutheran Church

& Sch. v. EEOC*, 565 U.S. 171, 186 (2012), and "to engage freely in ecclesiastical

---

[6] Plaintiffs also reference an Illinois statutory provision—Ill. Stat. Ch. 225
§450/16(b)(6)—but that provision does not exist.  To the extent that Plaintiffs meant
to cite Ill. Stat. Ch. 225 §460/16(b), that statute does not create a fiduciary
relationship between donors and charitable organizations.  *Contra* Br.27 n.13.
Instead, it creates such a relationship between the agent of a charitable organization
and "the public" at large to ensure that charitable agents manage donations in a
transparent and accountable manner.

discussions with members and non-members," *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002). This concept is known as the church autonomy doctrine, and it applies with full force to the courts. As a result, "[t]he church autonomy doctrine 'prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity.'" *Gaddy*, 148 F.4th at 1211. "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020).

The church autonomy doctrine comes from a "long line" of precedent. *Gaddy*, 148 F.4th at 1208. Over 150 years ago, the Supreme Court held that "civil courts" have "no jurisdiction" to decide any matter that is "ecclesiastical in its character." *Watson v. Jones*, 80 U.S. (13 Wall.) 697, 733 (1871). The Supreme Court has repeatedly reiterated the point ever since. *See, e.g.*, *Jones v. Wolf*, 443 U.S. 595, 602 (1979); *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713-14 (1976). And it has done so because there is a "substantial danger" of infringing on religious freedom if courts "become entangled in essentially religious controversies," *Milivojevich*, 426 U.S. at 709, and "First Amendment values are plainly jeopardized when ... litigation is made to turn on the resolution by civil courts

of controversies over religious doctrine and practice," *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969); *see McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 2025 WL 2602899, at *8-*9 (5th Cir. Sept. 9, 2025) ("Civil courts cannot apply civil rules to religious organizations when doing so necessarily implicates questions of faith, scripture, … religious doctrine[,]" "church governance[,]" and "internal communications").

"The church autonomy doctrine's protections can manifest in many ways" and in many contexts. *Gaddy*, 148 F.4th at 1211. That includes cases involving fraud allegations, as the doctrine contains no general exception for fraud. *See United States v. Ballard*, 322 U.S. 78 (1944) (affirming district court's dismissal of fraud claim against faith healers). "Even though society has an interest in protecting against fraud, the [Supreme] Court has held that the Religion Clauses, and the values underlying them, take priority when the two conflict." 148 F.4th at 1215. While there may be room for fraud claims in cases of obvious self-dealing or other narrow circumstances, if "the dispute is, at bottom, 'an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law,'" then "the protection of the Religion Clauses" kicks in, and "the claim fails." *Gaddy*, 148 F.4th at 1211. And because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Cath.*

*Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam), a defense grounded in the church autonomy doctrine should be "resolved at the earliest possible stage of litigation," *Bryce*, 289 F.3d at 654, including the motion-to-dismiss stage, *see Gaddy*, 148 F.4th at 1212 & n.5.

**B.    Plaintiffs' Lawsuit Is Squarely Barred by the Church Autonomy Doctrine.**

The church autonomy doctrine requires dismissal of Plaintiffs' complaint. Plaintiffs do not (and cannot) contend that the Church's financial decisions have been motivated by anything but a sincere desire "to fulfill [their] discernment of the divine will for [the Church's] ministry." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 332 (4th Cir. 1997). Plaintiffs' basic objection is that the Church has used donated funds in "manners antithetical to the purported mission" of the Church—namely, by taking a "portion of their donations" and "invest[ing]" those funds in accounts managed by Ensign Peak, as opposed to spending the funds immediately for charitable purposes. App.V1.98. To prove those claims, Plaintiffs would parse the statements of Church leaders on religious subjects, and, if successful, have a special master take over management of church finances. When it comes to the threat to religious liberty and church autonomy, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

Adjudicating these claims in civil court would plainly run afoul of the First Amendment. As other courts have recognized, "[h]ow [the] church spends

worshippers' contributions is … central to the exercise of religion." *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F.Supp.3d 71, 80 (D.D.C. 2019); *see also, e.g.*, *Harris v. Matthews*, 643 S.E.2d 566, 571 (N.C. 2007); *In re Godwin*, 293 S.W.3d 742, 750 (Tex. App. 2009); *Bible Way Church v. Beards*, 680 A.2d 419, 429 (D.C. App. 1996). That is no less true here: The disposition of tithes and other donated funds is explicitly committed by scripture to "a council, composed of the First Presidency of [the] Church" and other senior Church leaders. Doctrine and Covenants §120, perma.cc/57JS-DTXR. As a result, adjudicating questions concerning the manner in which Church leaders "expend funds raised by the [C]hurch" to advance its mission fall squarely "within the ecclesiastical sphere that the First Amendment protects from civil court intervention." *Bell*, 126 F.3d at 332-33. And the notion that courts may parse the statements of religious leaders to believers on religious subjects and require church leaders to make additional disclosures about church finances and to speak with more precision about the manner in which they manage sacred donations would self-evidently intrude on the "rights of the church to discuss church doctrine and policy freely." *Bryce*, 289 F.3d at 658. "Nothing says 'entanglement with religion' more than [the] position that the head of a religious faith should have spoken with greater precision about inherently religious topics, lest the Church be found liable for fraud." *Huntsman*, 127 F.4th at 798 (Bress, J., concurring); *see El Pescador Church v. Ferrero*, 594 S.W.3d 645, 658 (Tex. App.

50

2019) (rejecting fraud-based tithing claim as "necessarily embroil[ing] courts into … church governance matters").

The elements of Plaintiffs' claims underscore that courts could not resolve this lawsuit without entering forbidden territory.  For instance, to proceed with their claims for fraudulent inducement, fraudulent misrepresentation, and fraudulent concealment—and thus their unjust-enrichment claim, which is premised on the alleged fraud—Plaintiffs (who are current or former Church members) must allege and ultimately prove "materiality" and/or "reliance."  More specifically, Plaintiffs must demonstrate (1) that the subject matter of the fraud (*i.e.*, the alleged misrepresentation or concealed fact) qualified as material in the sense that an objectively reasonable person would find it important in determining how he or she would act; and (2) that they acted reasonably in relying on the representation.  *See Keith v. Mtn. Resorts Dev.*, 337 P.3d 213, 225-26 (Utah 2014); *Larsen v. Exclusive Cars, Inc.*, 97 P.3d 714, 716 (Utah Ct. App. 2004); *Yazd*, 143 P.3d at 289.  The district court expressed "concerns" that it could answer such questions without generating a "church autonomy doctrine problem," and those concerns are well-founded. App.V1.40 n.226.  Indeed, answering the materiality and reliance questions would inject courts into highly sensitive religious matters—*viz.*, who an objectively reasonable Church member is and whether an objectively reasonable Church member seeking to comply with a religious commandment like tithing would deem

it "important" to learn the particulars of the Church's financial operations before making donations to the Church. *See, e.g.*, *Huntsman*, 127 F.4th at 799 (Bress, J., concurring) (whether "a reasonable member of the Church …. would pay tithing based on the Church's representations about its spending decisions" is an "inherently religious question" beyond the purview of a secular court).

There is more. For the fraudulent-misrepresentation and fraudulent-inducement claims (and hence the unjust-enrichment claim too), a jury would have to parse Church sermons and publications for "false" statements concerning doctrinal questions. *Keith*, 337 P.3d at 225-26; *Larsen*, 97 P.3d at 716. That is because Plaintiffs allege that Church leaders, like then-President Hinckley, committed fraud by lying to the faithful in describing the Church's financial plans for tithes in General Conference sermons and concealing the truth by denying wrongdoing after the release of the IRS Letter. *See* App.V1.64, 91-93 & nn.53-56. But it is simply not "in the competence of courts" or juries "under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings" or prayerful statements from Church leaders. *See Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953). And the right of churches "to discuss church doctrine and policy freely ... with members and non-members" would mean nothing at all, *Gaddy*, 148 F.4th at 1211, if courts and juries could assign

liability after "flyspecking statements of faith," *Huntsman*, 127 F.4th at 813 (Bumatay, J., concurring in the judgment).

Resolving the fraudulent-misrepresentation claim (and, again, the unjust-enrichment claim) would generate still more constitutional issues. The fraudulent-misrepresentation claim emanates from Plaintiffs' view that the Church "made false statements … that tithing funds … would not be used for the financing of City Creek Center." App.V1.107. Adjudicating the claim thus would require a court to settle on the proper definition of "tithing funds"—*i.e.*, whether (as the Church believes) it encompasses just the funds donated to the Church or whether (as Plaintiffs believe) it also encompasses investment earnings on donated funds. That "would intrude on the Church's authority to define that divine concept for itself"—a concept that has existed since the 1830s. *Huntsman*, 127 F.4th at 796 (Bress, J., concurring).

Nor could the breach-of-fiduciary-duty claim escape the application of the church autonomy doctrine. Quite the opposite. "[T]o prove a breach of fiduciary duty," "a plaintiff must establish the relevant standard of care"—and "expert testimony will be required in the breach of fiduciary duty context to explain standard of care and breach issues where the average person has little understanding of the duties owed by particular trades or professions." *Gables,* 417 P.3d at 110-11. Put another way, Plaintiffs' breach-of-fiduciary-duty claim invites courts to announce "the standard of care to be followed by other reasonable clerics in the performance

of their ecclesiastical … duties." *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 206 (Utah 2001), *abrogated on other grounds by Williams v. Kingdom Hall of Jehovah's Witnesses*, 491 P.3d 852 (Utah 2021).  To put it mildly, that exercise would "foster an excessive government entanglement with religion." *Id.*; *see, e.g.*, *Church of Scientology Flag Serv. Org. v. City of Clearwater*, 2 F.3d 1514, 1536 (11th Cir. 1993) (courts may not declare themselves "the ultimate arbiters of the appropriate level of disclosure to the church's members in all matters of ecclesiastical fiscal administration").

Making matters worse, Plaintiffs' requested relief would further undermine the "independence from secular control or manipulation" that religious organizations are supposed to enjoy.  *Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).  Plaintiffs are demanding untold amounts of money in tithing refunds, a regular public accounting of Church spending, and the appointment of a "Special Master" or "panel" answerable only to the federal government to oversee Church finances.  App.V1.109-10.  That requested relief is not some mistake or oversight; it is the logical remedy for this extraordinary effort to intrude deeply into the Church's finances and internal affairs.

In sum, to avoid the church autonomy doctrine, Plaintiffs must demonstrate that this case is "purely secular."  *Bryce*, 289 F.3d at 657.  The notion that it is purely secular to entertain a request to embed federally appointed special masters on Church

councils and to require the Church to issue tithing refunds "sounds absurd, because it is." *Sekhar v. United. States*, 570 U.S. 729, 738 (2013). In reality, no amount of clever pleading can disguise the reality that a suit by current or former Church members for a tithing refund and a full accounting of inflows and outflows intrudes deeply into church autonomy and cannot be adjudicated by secular courts consistently with the First Amendment.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

## STATEMENT REGARDING ORAL ARGUMENT

The Church and Ensign Peak believe that oral argument would assist the Court

in deciding the important issues presented by this appeal.

Respectfully submitted,

RANDY T. AUSTIN
JUSTIN W. STARR
KIRTON MCCONKIE
36 S. State St., Ste. 1900
Salt Lake City, UT 84111
(801) 328-3600
raustin@kmclaw.com

MARK S. MESTER
LATHAM & WATKINS LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
(312) 876-7700
Mark.mester@lw.com

JASON R. BURT
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
jason.burt@lw.com

s/Paul D. Clement
PAUL D. CLEMENT
  *Counsel of Record*
ANDREW C. LAWRENCE
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendants-Appellees*

September 22, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

September 22, 2025

<u>s/Paul D. Clement</u>
Paul D. Clement

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

a.    all required privacy redactions have been made;

b.    the hard copies submitted to the clerk are exact copies of the ECF submission;

c.    The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, SentinelOne, and according to the program is free of viruses.

September 22, 2025

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement