No. 25-4068

# In the United States Court of Appeals for the Tenth Circuit

IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
TITHING LITIGATION

On Appeal from the United States District Court
for the District of Utah-Salt Lake City
No. 2:24-MD-03102-RJS-DAO, Hon. Robert J. Shelby

**BRIEF OF *AMICI CURIAE***
**MAJOR RELIGIOUS ORGANIZATIONS AND RELATED ENTITIES**
**SUPPORTING APPELLEES AND AFFIRMANCE**

Gene C. Schaerr
James C. Phillips
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

SEPTEMBER 29, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

IDENTITY, INTEREST, AND AUTHORITY TO FILE OF
  THE *AMICI CURIAE* ...........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

STATEMENT ...........................................................................................4

ARGUMENT ...........................................................................................5

  I.     Appellants' Suit Would Require Courts to Decide Quintessentially Religious Questions, in Violation of the First Amendment's Ecclesiastical Abstention Doctrine, and In So Doing Would Threaten All Religious Bodies. ...................................................5

  II.    Litigation of Appellants' Suit Would Violate the First Amendment's Church Autonomy Doctrine by Requiring Courts to Second-Guess a Religious Decision on a Core Issue of Church Governance—How to Spend Church Resources In Furtherance of the Church's Religious Mission. ...................................................11

  III.   The Church Autonomy Doctrine's Fraud Exception is Moribund, but Even if Not, Its Two Narrow Triggers are Absent Here. ...................17

       A.    There is no overt self-dealing fraud here. ........................................19

       B.    There is no quasi-contract fraud here. ..............................................21

  IV.   "Neutral Principles" is Not a Global Exception to Church Autonomy and Does Not Apply Outside of the Context of Property Division Incident to a Schism. ...................................................23

CONCLUSION .......................................................................................27

CERTIFICATE OF COMPLIANCE ...........................................................29

CERTIFICATE OF DIGITAL SUBMISSION ...............................................30

APPENDIX: List of *Amici Curiae* .........................................................31

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Africa v. Commonwealth of Pennsylvania,*
662 F.2d 1025 (3d Cir. 1981)...............................................................8

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam,*
387 F. Supp. 3d 71 (D.D.C. 2019) ......................................................14

*Anderson v. Watchtower Bible & Tract Soc'y of N.Y., Inc.,*
No. M2004-01066-COA-R9-CV, 2007 WL 161035
(Tenn. Ct. App. Jan. 19, 2007)...........................................................19

*Colo. Christian Univ. v. Weaver,*
534 F.3d 1245 (10th Cir. 2008) ..........................................................21

*Corp. of Presiding Bishop of Church of Jesus Christ of
Latter-day Saints v. Amos,* 483 U.S. 327 (1987) ................................12

*Erdman v. Chapel Hill Presbyterian Church,*
286 P.3d 357 (Wash. 2012)................................................................26

*Espinosa v. Rusk,*
634 F.2d 477 (10th Cir. 1980) ............................................................21

*Gaddy v. Corp. of President of Church of Jesus Christ of
Latter-Day Saints,* 451 F. Supp. 3d 1227 (D. Utah 2020) ..................26

*Gaddy v. Corp. of President of Church of Jesus Christ of
Latter-Day Saints,* 551 F. Supp. 3d 1206 (D. Utah 2021) ..................27

*Gonzalez v. Roman Cath. Archbishop of Manila,*
280 U.S. 1 (1929)...............................................................................17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.
E.E.O.C.,* 565 U.S. 171 (2012) .............................. 6, 10, 11, 18, 25

*Huntsman v. Corp. of the President of the Church of Jesus Christ
of Latter-Day Saints,* 127 F.4th 784 (9th Cir. 2025)........................ 14, 15, 16, 17

*Hutchison v. Thomas,*
789 F.2d 392 (6th Cir. 1986)..............................................................26

*Jones v. Wolf*,
　443 U.S. 595 (1979) ............................................................... 18, 24, 26

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox*
　*Church in N. Am.*, 344 U.S. 94 (1952) ................................. 7, 10, 12, 17

*McCarthy v. Fuller*,
　714 F.3d 971 (7th Cir. 2013) .......................................................... 9, 10

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
　--F.4th--, 2025 WL 2602899 (5th Cir. Sept. 9, 2025) ................... 24, 25

*Md. & Va. Eldership of Churches of God v. Church of God*
　*at Sharpsburg, Inc.*, 396 U.S. 367 (1970) ..................................... 23, 24

*Mitchell v. Helms*,
　530 U.S. 793 (2000) ............................................................................20

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
　591 U.S. 732 (2020) ..................................................... 3, 11, 12, 18, 25

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l*
　*Presbyterian Church,* 393 U.S. 440 (1969) ............................... 10, 16, 23

*Schmidt v. Cath. Diocese of Biloxi*,
　18 So.3d 814 (Miss. 2009) ................................................... 21, 22, 23

*Serbian E. Orthodox Diocese v. Milivojevich*,
　426 U.S. 696 (1976) ............................................................ 17, 18, 24

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,*
　450 U.S. 707 (1981) ...........................................................................3, 8

*Tilton v. Marshall*,
　925 S.W.2d 672 (Tex. 1996) ............................................................ 19, 20

*United States v. Ballard*,
　322 U.S. 78 (1944) ............................................................................27

*United States v. Lee*,
　455 U.S. 252 (1982) ..............................................................................9

*Van Osdol v. Vogt*,
　908 P.2d 1122 (Colo. 1996) ..............................................................18

iii

*Watson v. Jones,*
    80 U.S. 679 (1871) ................................................... 10, 11, 17, 23, 25

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) ...................................................9

**Other Authorities**

*Abundant Rain During Drought,* Archive:Islam .......................................6

Stephanie H. Barclay et al.,
    *Original Meaning and the Establishment Clause: A Corpus
    Linguistics Analysis*, 61 Ariz. L. Rev. 505 (2019).............................16

*Deuteronomy* ................................................................................1

Carl H. Esbeck,
    *Church Autonomy, Textualism, and Originalism: SCOTUS'S
    Use of History to Give Definition to Church Autonomy*,
    108 Marquette L. Rev. 705 (2025)......................................13

Alexander Hamilton,
    *Remarks on the Quebec Bill: Part Two*,
    Rivington's N.Y. Gazetteer (June 22, 1775)............................... 16, 17

*Genesis* ................................................................................1

Douglas Laycock,
    *Towards a General Theory of the Religion Clauses:
    The Case of Church Labor Relations and the Right to Church
    Autonomy*, 81 Colum. L.Rev. 1373 (1981)........................................12

*Malachi* (KJV) ...........................................................................1

Michael W. McConnell & Luke W. Goodrich,
    *On Resolving Church Property Disputes*,
    58 Ariz. L. Rev. 307 (2016) ...............................................25

Merriam-Webster.com Dictionary........................................................13

*Numbers* ................................................................................1

Lael Weinberger,
    *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253 (2023)..............26

## IDENTITY, INTEREST, AND AUTHORITY TO FILE
## OF THE *AMICI CURIAE*[1]

*Amici* (listed in the Appendix) are major religious denominations and related organizations that collectively represent millions of Americans of faith, and they are deeply troubled by the constitutional violations this lawsuit would represent if allowed to proceed. That is not because *Amici* theologically agree with The Church of Jesus Christ of Latter-day Saints (Church) about tithing. Their concern, rather, is that if this Court reverses the district court and Appellants' lawsuit is allowed to proceed, no religious organization will be safe from judicial intrusion into matters of internal governance, as shown by this multi-district litigation involving suits from around the country. *Amici* therefore ask this Court to affirm the decision below.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At is core, this case is about the meaning of a religious term—tithing—and how it and other resources should be used to further a religious organization's religious missions. The Judeo-Christian practice of paying tithes is at least four millennia old. *See Genesis* 14:20; *Numbers* 18:21-28; *Deuteronomy* 14:23, 28. Today, millions of Jews and Christians alike heed the words in Scripture to "[b]ring ye all the tithes into the storehouse." *Malachi* 3:10 (KJV). And other faith traditions

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any other person other than *Amici*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. Counsel for all parties consent to the filing of this brief.

have their own type of religiously motivated financial and charitable offerings, such as zakat in Islam.

Despite being long and widely practiced, no religious consensus exists on tithing. Is it required or recommended? Is it calculated on gross or net income, or some other measure? Is it still called a tithe after receipt by the religious organization, and does it include interest or other return that has accrued on the donation? And finally, how can or should these donations be spent? Across faiths and even within faiths, there are multiple responses to these questions. Yet Appellants insist that a civil judge possesses final theological prowess to answer these questions, which is the religious dispute at the heart of this case. To allow courts to decide such disputes will run through the First Amendment's guardrail—a mishap Appellants' suit cannot survive.

If allowed to proceed, this suit would violate the First Amendment in at least two basic ways: First, its litigation would require that a civil judge decide an intra-religious dispute over the meaning of the religious practice of tithing and other religious donations. Specifically, in this case a judge and/or jury would have to first decide which of differing religious understandings of tithing certain leaders of The Church of Jesus Christ of Latter-day Saints—a hierarchical church—were invoking when they made statements challenged by Appellants. Then a judge or jury would have to determine whether Appellants reasonably relied on those statements. Such

inquiries violate the ecclesiastical abstention doctrine, which has long been held to be required by the First Amendment. *See, e.g., Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,* 450 U.S. 707 (1981).

Second, and relatedly, the suit would necessarily inject civil courts into the Church's internal governance—with government actors second-guessing church leaders' major religious judgments about *how* and *when* to use the organization's resources. After all, Appellants' fundamental claim is that the Church should spend more of its wealth on current priorities and save less for future needs—like preparing the infrastructure it believes will be needed to carry out Jesus' work in preparation for the Millenium. Such an analysis and decision would squarely violate the First Amendment's church autonomy doctrine. *See, e.g., Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020).

Appellants, moreover, cannot skirt these First Amendment barriers by relying on fraud as an exception to the church autonomy doctrine, or by invoking the "neutral principles of law" approach. It's not clear the fraud exception still exists. But even if it does, the narrow contexts where courts have applied it—overt-self dealing and quasi-contracts—are not present here. Further, the neutral-principles approach only applies in the context of property disputes downstream from a church schism, and only if it does not involve inquiring into religious doctrine or deciding

a religious controversy. That's not even close to the context here, yet that's exactly the forbidden First Amendment ground Appellants ask this Court to tread.

*Amici* therefore urge the Court to affirm the dismissal of this massive entanglement between church and state.

## STATEMENT

Appellants actively seek to foment this entanglement through this suit, a nationwide class action. They contend they made financial contributions to the Church, in the form of tithing or other donations, and that the Church misrepresented how those funds would be used by (1) diverting significant portions of those donations to investments rather than spending them on religious and charitable works, as Plaintiffs understood the Church had promised to do; and (2) spending such donations on commercial enterprises, such as building a mall or shoring up a Church-owned commercial entity. *See* App.V2.387-88. In support of their argument, Plaintiffs point to statements by various Church leaders and employees that tithing funds would not be spent on such endeavors. *See* App.V2.386.

Asserting claims of breach of fiduciary duty, fraud, and unjust enrichment, Plaintiffs sought, among other things, an injunction against the Church's financial decisions and practices. App.V2.389. They also sought "an order requiring regular public accounting by Defendants as to the collection, use and disposition of collected funds and interest and income earned from these funds," and "the appointment of a

Special Master or an equally authorized panel of neutrals to monitor" these financial activities. App.V1.109.

While acknowledging that "weighty First Amendment issues may be implicated" by Appellants' theories of liability, *see* App.V2.418 n.229, the district court avoided the constitutional issues here by holding that the statute of limitations barred Appellants' claims and that the claims were not adequately pled. *See* App.V2.379. However, as the First Amendment issues were raised below, they provide alternative grounds for this Court to affirm the district court's decision dismissing the suit.

## ARGUMENT

### I. Appellants' Suit Would Require Courts to Decide Quintessentially Religious Questions, in Violation of the First Amendment's Ecclesiastical Abstention Doctrine, and In So Doing Would Threaten All Religious Bodies.

*Amici* support Appellees here because there is nothing about Appellants' lawsuit over the meaning and use of "tithing" that would cabin their logic to a definable set of cases involving the Church, or even just Christian organizations, or even just tithing. If a court can put on blinders by characterizing as purely "secular" an inquiry into the meaning of a religious term or the religious rationale behind the use of donated funds, as indicated and decided by a church's highest ecclesiastical leaders, then there is no autonomous ground left for religious organizations.

1. Under Appellants' logic, every religious dispute can be reframed as "secular," thereby circumventing constitutional protections for religious entities and societies. For example, Catholic teaching that the bread and wine consumed during Mass have been transformed into the body and blood of Christ could be considered a secular question, with the Catholic Church liable for that transformation as determined by material scientists. Or religious claims by Muslims about events in the life of Mohammed, such as causing it to rain during a drought in Medina,[2] could be investigated by historians and geological hydrologists, and liability imposed based on their findings.

This transforming the sacred into the secular by *ipse dixit* in Appellants' arguments has no limiting principle. Appellants' logic, if countenanced by this Court, will thus create a threat to religious groups that matters of doctrine or internal governance will be probed by civic factfinders, with liability to follow from their supposedly "secular" findings. *Compare Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012) (holding that "action interfer[ing] with the internal governance of the church" violates the First Amendment); *id*. at 186 (observing that the First Amendment "radiates … a spirit of freedom for religious organizations, an independence from secular control or

---

[2] *Abundant Rain During Drought,* Archive:Islam, https://tinyurl.com/5fpr793f (last visited Sept. 24, 2025).

manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine" (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952))).

2. That broad threat is not the only one: Whenever a religious organization, via one of its leaders or an official publication, says something about the religious status or use of donated funds that can be contradicted by an allegation from a disgruntled former employee or member, a jury or judge, under Appellants' reasoning, will now have to decide which party has the better theological understanding. This means members may spring up everywhere to sue over a comment made at some time about some use of funds that a now disgruntled member donated *generally* to his or her religious organization.

This very multi-district litigation suit is tangible evidence that *Amici* do not exaggerate. And, if Appellants have their way, instead of being dismissed out of the gate under the church autonomy doctrine, courts or juries will ultimately decide these religious disputes. While such an innovative cause of action may be an attractive outcome for the trial bar, it will breed constitutional chaos for religious organizations and hopelessly entangle courts in religious affairs.

3. Such a result would also violate the First Amendment's "ecclesiastical abstention doctrine." That doctrine requires courts to abstain from making religious

determinations, regardless whether the determination actually intrudes into or interferes with a church's autonomy. *See Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981) ("Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy."). And that is what Appellants seek here—for a court to adopt their reading of the Church's scripture and doctrine on tithing.

Precedent squarely forecloses Appellants' approach. For example, when a Jehovah Witness sought unemployment compensation after being fired for refusing to make army tanks for religious reasons, a state court "appear[ed] to have given significant weight to the fact that another Jehovah's Witness had no scruples about working on tank turrets; for that other Witness, at least, such work was 'scripturally' acceptable." *Thomas*, 450 U.S. at 715. But the Supreme Court concluded that "the judicial process is singularly ill equipped to resolve [interfaith] differences." *Id*. And so the Court reversed the state court, *id*. at 720, because "in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation," *id*. at 716.

Likewise, when the federal government in another case "contend[ed] that payment of social security taxes will not threaten the integrity of the Amish religious belief or observance," the U.S. Supreme Court refused to countenance that

argument. The Court held instead that, under the First Amendment, "[i]t is not within the judicial function and judicial competence, … to determine whether appellee or the Government has the proper interpretation of the Amish faith; courts are not arbiters of scriptural interpretation." *United States v. Lee*, 455 U.S. 252, 257 (1982) (cleaned up). So too here.

This doctrine of ecclesiastical abstention, moreover, applies regardless whether there is a pending *religious* dispute. That is because, as then-Judge Gorsuch observed, "judges are hardly fit arbiters of the world's religions." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014). To attempt to do so "would risk in the attempt … many mistakes[,] … given our lack of any comparative expertise when it comes to religious teachings, perhaps especially the teachings of less familiar religions." *Id*. *See also McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013) ("The commingling of religious and secular justice would violate … the First Amendment, which forbids the government to make religious judgments.").

In short, for a court to get into a determination of what the religious term and practice of tithing means, or how tithing donations can properly be used, would violate the First Amendment's ecclesiastical abstention doctrine.

4.      Additionally, resolving this religious dispute over the proper meaning and use of tithing would violate church autonomy in a few ways: by usurping the Church's authoritative role in making such doctrinal determinations, and potentially

by rejecting that authoritative determination in favor of the reading of those who have no authority to interpret the Church's scripture and doctrine.

As courts have repeatedly declared, the First Amendment "forbids" courts from "determin[ing] matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 450 (1969). Thus, as the Supreme Court put it just over a decade ago, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [these] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Hosanna-Tabor*, 565 U.S. at 185-86 (quoting *Watson v. Jones,* 80 U.S. 679, 727 (1871)). *Accord Kedroff*, 344 U.S. at 120-21 (holding that the First Amendment requires that the state defer to a religion's determination of articles of faith even where such decisions are merely incidental to the dispute at hand).

This is so because "[t]he harm of such a governmental intrusion into religious affairs would be irreparable," "undermin[ing] the authority and autonomy of the Church." *McCarthy,* 714 F.3d at 976, 978. Hence, once the church in one such case submitted authoritative evidence on the religious question at issue, neither judge nor jury had authority to question it. *See id*. at 978. To do otherwise would ignore the Constitution's command that "[t]he First Amendment protects the right of religious

institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe*, 591 U.S. at 737 (cleaned up).

Therefore, any effort by a court to determine the meaning and proper use of tithing, other than deferring to the Church's authoritative statement, would transgress the First Amendment by violating the church autonomy doctrine.

## II. Litigation of Appellants' Suit Would Violate the First Amendment's Church Autonomy Doctrine by Requiring Courts to Second-Guess a Religious Decision on a Core Issue of Church Governance—How to Spend Church Resources In Furtherance of the Church's Religious Mission.

In another important way, litigation of Appellants' claims would further violate the First Amendment-based church autonomy doctrine, which the Supreme Court has recognized for over a century and a half. *See Watson,* 80 U.S. 679 (1871). This "general principle" derives from the "constitutional foundation" of "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 591 U.S. at 747. In other words, "action interfer[ing] with the *internal governance* of the church" violates the First Amendment. *Hosanna-Tabor*, 565 U.S. at 188 (emphasis added). *See also id*. at 186 (observing that the First Amendment "radiates ... a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church

government as well as those of faith and doctrine." (quoting *Kedroff*, 344 U.S. at 116)).

1. This autonomy "does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746. Hence, under the Constitution, "religious organizations have an interest in autonomy in ordering their internal affairs, so that they may be free to[] … 'define their own doctrines, resolve their own disputes, and run their own institutions.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 341-42 (1987) (Brennan, J., concurring) (quoting Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L.Rev. 1373, 1389 (1981)). It is not surprising, then, that "[d]etermining that certain activities are in furtherance of an organization's religious mission[] … is thus a means by which a religious community defines itself." *Id*. at 342 (Brennan, J., concurring). And "[s]olicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well." *Ibid*.

Whether referred to as "internal governance," "internal government," "church government," "internal management decisions," "ordering … internal affairs,"

"run[ning] their own institutions," or "determining [which] activities … further[] …
an organization's religious mission," it is all referencing the same activity and the
same right. And that right logically includes, among others, making major decisions
about how to spend the organization's sacred funds. Those decisions are among the
most existential to the "governance" of a religious organization—as they are to
secular ones—since erring on this "internal management decision" could lead to the
organization's demise, or severely diminished capabilities, thwarting its religious
mission.[3]

2. That is why courts and judges have regularly recognized that lawsuits
challenging religious organizations' decisions about the use of donations squarely
implicate the church autonomy doctrine. For example, in *Ambellu v. Re'ese Adbarat
Debre Selam Kidist Mariam*, plaintiffs contended that after making regular
contributions to a church, the church leaders "engaged in conversion of these

_____

[3] Indeed, Merriam-Webster's defines "governance"—which the Supreme Court
has regularly recognized as one important aspect of church autonomy—as "the act
or process of governing or overseeing the control and direction of something (such
as a country or an organization)." *Governance,* Merriam-Webster.com Dictionary*,*
https://tinyurl.com/yb5kd45v (last visited Sept. 29, 2025). One cannot possibly
"govern" an organization in this ordinary and fundamental sense if one cannot
control major decisions about the use of its resources. *See also* Carl H. Esbeck,
*Church Autonomy, Textualism, and Originalism: SCOTUS'S Use of History to Give
Definition to Church Autonomy*, 108 Marquette L. Rev. 705, 710, 713 n.30 (2025)
(while "[t]he Supreme Court's church autonomy cases are rather few," "the Court's
general language concerning the scope of immunity provides helpful starting
points").

contributions by depriving the Parishioners of their right to vote on how the monies are used." 387 F. Supp. 3d 71, 80 (D.D.C. 2019) (internal citation omitted). And the plaintiffs also "allege[d] unjust enrichment and ask[ed] the Court to place the Church's assets into a constructive trust." *Ibid*.

But the court would have none of that argument because "[j]udicial review of these claims would fall afoul of the First Amendment." *Id*. That's because "[h]ow a church spends worshippers' contributions is, like the question of who may worship there, central to the exercise of religion." *Id*. Thus, the plaintiffs' desired remedy "would constitute an impermissible judicial interference with the Church's ability to make governance and spending decisions." *Id*.

More recently, the Ninth Circuit decided the case on which the Appellants have modeled their lawsuit—*Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784 (9th Cir. 2025) (en banc). There, a former member of The Church of Jesus Christ of Latter-day Saints brought fraud claims against his church—the Appellee here—over the Church's use of tithing funds, making arguments that Appellants have reiterated in this litigation. *See id*. at 786-88. In a unanimous ruling, a majority of the en banc panel (ten of the eleven judges) ruled that the Church had not committed fraud and dismissed the suit. *See id*. at 790-92.

However, five of the en banc court members determined that the lawsuit would violate the church autonomy doctrine regardless. *See id*. at 792-800 (Bress, J., concurring); *id*. at 800-14 (Bumatay, J., concurring in the judgment only). Four reasoned that, "[u]nder the First Amendment, the plaintiff's challenge to the Church's understanding of tithing is not susceptible to resolution in a court of law, lest the judiciary wrest control from religious authorities over matters of theological concern." *Id*. at 793 (Bress, J., concurring). And, according to the four-judge concurrence, "[i]t would do so in two main ways." *Id*. at 796.

"*First*, for [the plaintiff] to prevail, a court or jury would need to agree with his view of what 'tithing funds' in the Church includes." *Id*. "But," the four judges noted, "that would intrude on the Church's authority to define that divine concept for itself." *Ibid*. Furthermore, "[r]eligious disputes restated in the elements of a fraud claim do not lose their inevitably religious character, just as employment disputes involving persons with religious duties cannot be regarded as purely secular, either." *Id*. at 798

"*Second*, for [the plaintiff] to prevail, a court or jury would further need to agree that he reasonably relied on the Church's alleged misrepresentations. But that too would embroil the courts in a sectarian dispute." *Id*. at 799. After all, "courts and juries making determinations about *why* a reasonable member of the Church of Jesus Christ of Latter-day Saints would or should tithe" would involve "inherently

religious questions." *Ibid*. And "[p]lainly, the First Amendment forbids civil courts from playing such a role." *Id*. (quoting *Presbyterian Church*, 393 U.S. at 450). *See also id*. at 800 (observing that the plaintiff "cannot ask the judiciary to intrude on the Church's own authority over core matters of faith and doctrine. … We as courts are not here to emcee religious disputes, much less decide them. The First Amendment restricts our role as it protects religious organizations from lawsuits such as this.").

Concurring separately, Judge Bumatay pointed out that "resolving [plaintiff's] claims requires swimming in a current of religious affairs. What is a 'tithe'? Who can speak for the Church on the meaning of 'tithes'? What are Church members' obligations to offer 'tithes'?" *Id*. at 800. And "[t]hese are questions that only ecclesiastical authorities—not federal courts—can decide." *Ibid.*

Judge Bumatay also noted the historical pedigree of tithing and church autonomy, noting that "[t]ithes are a historically sensitive area of a church's independence from the state." *Id*. at 812 (citing Stephanie H. Barclay et al., *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 548-49 (2019) (describing why state action on "church tithes [would] involve[] government interference in church affairs")). And Judge Bumatay looked to Alexander Hamilton's comments on the then-recently enacted Quebec Bill. *See id*. at 812 (citing Alexander Hamilton, *Remarks on the Quebec Bill: Part Two*, Rivington's N.Y. Gazetteer (June 22, 1775)). That bill would have allowed Catholic

clergy to "'hold, receive and enjoy their accustomed dues and rights.'" *Id*. (quoting

Hamilton, *Remarks*). "But Hamilton realized that if tithes are the legal 'property' of

a church"—which of course they are—the legislation amounts to government

control over religion." *Id*. And so "Hamilton recognized that a government's

interference with a church's tithes, even if in a positive way, 'converts it into an

establishment.'" *Id*. (quoting Hamilton, *Remarks*).

Two hundred and fifty years after Hamilton's insights, the same can be said

here. Major decisions on how to best spend a church's tithes (or other donations) to

further its religious mission are a quintessential matter of church "governance."

Therefore, such decisions are protected from governmental interference by the First

Amendment's church autonomy doctrine.

## III. The Church Autonomy Doctrine's Fraud Exception is Moribund, but Even if Not, Its Two Narrow Triggers are Absent Here.

Trying to skate around the First Amendment, Appellants rely upon various

supposed "exceptions" to the church autonomy doctrine. Those are grounded in

Supreme Court dicta, which at one time recognized three exceptions to the so-called

"*Watson* rule" of church autonomy: "fraud, collusion, or arbitrariness." *See*

*Gonzalez v. Roman Cath. Archbishop of Manila,* 280 U.S. 1, 16 (1929) (citing

*Watson,* 80 U.S. at 727, 733); s*ee also Serbian E. Orthodox Diocese v. Milivojevich,*

426 U.S. 696, 712 (1976) (labeling *Gonzalez*'s "exception to the Watson rule" as

"dictum only"). However, after noting that it had previously (in *Kedroff*) elevated

the church autonomy doctrine to constitutional status, the Supreme Court in *Serbian Eastern Orthodox* observed that "no decision of this Court has given concrete content to or applied" these exceptions. 426 U.S. at 712-13. Accordingly, the Court rejected the exception relevant in that case—arbitrariness—as prohibited by the First Amendment, also noting that fraud and collusion had no relevance in that case. *See id.* at 713. Since then, the Court has never held that there is a fraud or collusion exception to the First Amendment's church autonomy doctrine. *See Jones v. Wolf*, 443 U.S. 595, 609 n.8 (1979) (noting that "[t]here is no suggestion in this case … of 'fraud' or 'collusion,'" so "[i]n the absence of such circumstances" the church autonomy doctrine "'mandate[d] that civil courts shall not disturb the decisions'" of church officials (citations omitted)). In short, a supposed fraud exception to church autonomy has not been mentioned by the Supreme Court in almost half a century, and the Court has never clearly held that such a claim ever existed consistent with the First Amendment.[4]

---

[4] In the Court's most recent church autonomy cases—*Hosanna-Tabor*, 565 U.S. 171; *Our Lady of Guadalupe*, 591 U.S. 732—there is nothing about fraud as a possible exception to church autonomy.

Moreover, even if this Court determined that a fraud exception to the church autonomy doctrine exists, its application would require the religious body to have secular purposes—the exception cannot apply to a sincere religious decision about how to use tithing. *Van Osdol v. Vogt*, 908 P.2d 1122, 1134 (Colo. 1996) (determining that "inherently ecclesiastical" decisions are "logically inconsistent with a fraud or collusion exception"); *accord Anderson v. Watchtower Bible & Tract*

In any event, the two limited circumstances recognized by a few state courts—overt self-dealing or quasi-contract—are not present here.

## A.     There is no overt self-dealing fraud here.

The Texas Supreme Court laid out a framework for overt self-dealing fraud claims in the church autonomy context in *Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996). There the appellants sued a televangelist and his church for (among other claims) fraud, after donating thousands of dollars accompanied by prayer requests. *Id*. at 675. The appellants alleged the pastor had fraudulently claimed that he would "personally and actually read, touch and pray over each of these requests," if they would send him money, and that by his representation, "the one making the vow … will receive whatever is requested." *Id*. at 676.

The court determined that the appellants' "fraud claims fall into two categories": (1) that the televangelist "would perform certain concrete acts"; and (2) "allegedly fraudulent and deceitful representations of religious doctrine or belief." *Id*. at 679. The court found no First Amendment danger in allowing the first type of fraud claim to go forward because, "[a]lthough the trier of fact must determine whether [the televangelist] made these promises and failed to perform

<hr>

*Soc'y of N.Y., Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at \*12 (Tenn. Ct. App. Jan. 19, 2007) (declaring that "[w]here purely ecclesiastical and protected actions are involved, inquiring into pretext" would violate the First Amendment).

them, Appellants may satisfy the falsity element of a fraud claim by proving that [the televangelist] had no intention of personally reading, touching, and praying over their prayer requests at the time he said he would do so." *Id*.

However, the court found that the second category of claims crossed the constitutional line because, "[w]hether or not made sincerely, such representations are statements of religious doctrine or belief." *Id*. And so "the trier of fact" would be forbidden from "hear[ing] evidence regarding them or pass[ing] on their veracity" under the First Amendment. *Id*. at 680.

Applying that framework here, Appellants' fraud claim cannot pass constitutional scrutiny. That's because, in the context of tithing payments by a donor to the Church, one cannot separate out "concrete acts" from "representations of religious doctrine or belief." *Id*. at 679. For example, Appellants may argue that the promise by ecclesiastical leaders that no tithing funds would be spent on the City Creek Mall project is the "concrete act" that a trier of fact can investigate. However, to factually probe into that act requires an investigation of the meaning of tithing. And that would mean the court's choosing between Appellants' apparent definition—they never actually provide a clear one—or the definition used by church leaders. Moreover, "[i]t is well established[] … that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion). *See also Espinosa v. Rusk*, 634 F.2d

477, 479-80 (10th Cir. 1980) (charitable solicitation regulation requiring civil authorities to first distinguish between "spiritual" or temporal motive of donors, and require reporting of only the latter, violated church autonomy), *aff'd mem.,* 456 U.S. 951 (1982) (granting appeal and affirming without opinion); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1264-65 (10th Cir. 2008) (requiring state actors "to wade into issues of religious contention" to determine if college was "pervasively sectarian" would violate the First Amendment).

In short, the First Amendment forbids applying this version of the fraud exception (assuming it exists) to the church autonomy immunity raised here.

### B.    There is no quasi-contract fraud here.

The other fraud exception to the church autonomy doctrine that a few state courts have recognized is based in quasi-contract—as for example, in *Schmidt v. Catholic Diocese of Biloxi*, 18 So.3d 814 (Miss. 2009). There, over 150 former parishioners of the St. Paul Catholic Church sued the Catholic Diocese, its bishop, and the cleric who was the priest at the church. *Id*. at 818. The appellants did so because they had made donations for the reconstruction of the church after it was damaged in a hurricane, arguing that the priest had made "misrepresentations in soliciting donations for the rebuilding efforts" because "plans were initiated to rebuild the St. Paul Church, and donations were solicited and given for that purpose." *Id*. at 818-19. A year and a half later, the bishop scrapped the plans to rebuild the St.

Paul Church "because of a shortage of priests" and because the church was located in a flood zone. *Id*. at 819. Appellants argued, among other things, that the priest "solicited donations for the rebuilding of the church, while having knowledge that the church would not be reopened," and thus engaged in intentional misrepresentation. *Id*. at 823.

Regarding this misrepresentation claim, the court observed that "the First Amendment does not protect fraudulent statements *that concern neither religious doctrine nor practice*." *Id*. at 831 (emphasis added) (citation omitted). And so the court allowed the intentional misrepresentation claim to go forward. *Id*. at 831-32.

*Schmidt* and cases like it differ significantly from the situation here. In *Schmidt*, the circumstances were such that the court merely asked whether there was an expressed condition on the donation and asked whether it was later waived by the donor. This requires resolution of a bare question of fact, not a mixed question of donors' "reasonable expectations" and the meaning of "tithe" in the Church's practice.

The case here is quite different. There is no claim that Church leaders were soliciting tithing for a specific purpose. In fact, what the Church allegedly claimed it would or would not use the tithing funds for was irrelevant to the religious mandate to pay tithing resting on all church members. Further, tithing is paid by church members with no strings attached. Appellants do not allege they imposed any

conditions on their tithing or other donations. Appellants, then, were not lured into making a donation based on representations—any representations were irrelevant to Appellants' unconditional, general religious duty to tithe. Likewise, the alleged fraudulent statements here "concern [questions of] … religious doctrine [and] practice," making an inquiry into fraud violative of the First Amendment. *Schmidt*, 18 So.3d at 831 (citation omitted).

Thus, a quasi-contract fraud exception to church autonomy doctrine—even if it exists—does not apply here.

## IV.    "Neutral Principles" is Not a Global Exception to Church Autonomy and Does Not Apply Outside of the Context of Property Division Incident to a Schism.

Besides the possibility of limited fraud exceptions to church autonomy, the Supreme Court has recognized a narrow context in which "neutral principles" of law may be applied to a dispute between religious entities, but only in lawsuits over church property by two factions that have divided the church. *See Watson,* 80 U.S. at 725; *Presbyterian Church*, 393 U.S. 440; *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367 (1970) (per curiam). It would be error to expand the "neutral principles" framework beyond property questions arising from a church schism. That is because the neutral principles "approach is endogenous to the church autonomy doctrine—it is not some freestanding exception to the doctrine that allows courts to tread on *terra sancta* in

the name of 'neutrality.'" *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, --F.4th--, 2025 WL 2602899, at *15 (5th Cir. Sept. 9, 2025). The principle is therefore not an exception to the church autonomy doctrine, but rather a protection of it, developed specifically for church property disputes where two factions each claim to be the "true" church.

The Supreme Court's most recent iteration of this principle, *Jones v. Wolf*, "involve[d] a dispute over the ownership of church property following a schism in a local church affiliated with a hierarchical church organization." 443 U.S. at 597. And the Supreme Court noted that the "'neutral principles of law' approach" could be "consistent with … constitutional principles," so long as the "analysis entailed 'no inquiry into religious doctrine.'" *Id*. at 602-03 (quoting *Md. & Va. Eldership of Churches,* 396 U.S. at 368).

That's because neutral principles "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges," and "thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id*. at 603. In other words, a court may choose this approach unless it "would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id*. at 604 (citing *Serbian E. Orthodox*, 426 U.S. at 709, where the plaintiff argued for a neutral principles approach, but the Court

appears to have rejected it based on the holding). *See also* Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 317, 336 (2016) (noting that church property disputes are "fundamentally different types of dispute[s]" as they concern two religious bodies both alleging they are the "true congregation," and hence both claim ownership of the disputed property, so a court cannot defer to an authoritative religious body on religious questions, requiring the court rather to look to extrinsic documents).

*Jones* points to two reasons a "neutral principles of law" approach cannot be applied here. First, this is not a property dispute between two factions of a church. *See McRaney,* 2025 WL 2602899, at *15 (observing that "the *Watson* Court very clearly limited this 'ordinary principles' dictum to 'such cases'—that is, to property-dispute cases" (quoting 80 U.S. at 725)). To expand "neutral principles" beyond the only context for which the Supreme Court has approved it risks allowing plaintiffs' lawyers to create a clever way to obliterate church autonomy entirely.

The impropriety of Appellants' proposed extension of the neutral-principles approach is illustrated in later cases involving disputes between a church and its former minister. *See Hosanna-Tabor*, 565 U.S. 171; *Our Lady of Guadalupe*, 591 U.S. 732. These cases make no mention of the neutral-principles approach. And other courts have likewise resisted any such expansion. *See McRaney,* 2025 WL 2602899, at *15 (rejecting a neutral-principles approach in a tort lawsuit against a

religious institution by a former executive director of an affiliated religious body); *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) (rejecting "neutral principles of law" exception to church autonomy doctrine as applied to state law tort claims, including defamation and intentional infliction of emotional distress, against a church in a challenge to a forced retirement); *Erdman v. Chapel Hill Presbyterian Church*, 286 P.3d 357, 368 (Wash. 2012) (rejecting "neutral principles of law" exception to church autonomy in state tort claim related to ministerial employment). *See also* Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253, 1276-77 (2023) ("The Supreme Court has never applied the neutral-principles analysis outside of the property-law context.").

Second, the neutral-principles approach cannot be applied here because it would require this Court to inquire into religious doctrine—the definition or practice of tithing. *See Jones*, 443 U.S. at 603. And since this would involve the Court in picking sides in a religious controversy, under *Jones* the Court "must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id*. at 604 (citation omitted). So, if one accepts that resolution here—that is, the Church's definition of tithing—fraud cannot be argued. *Accord Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 451 F. Supp. 3d 1227, 1238 (D. Utah 2020) (rejecting fraud claims because under the First Amendment "the court may not assess the veracity of the Church's religious beliefs"); *Gaddy v. Corp. of*

*President of Church of Jesus Christ of Latter-Day Saints*, 551 F. Supp. 3d 1206, 1221-22 (D. Utah 2021) (observing that "the critical issue underpinning the church autonomy doctrine is whether the dispute is secular or religious," and so rejecting a common-law fraud claim because it "is based on ecclesiastical issues and implicates the Church's fundamental religious beliefs"). *See also United States v. Ballard*, 322 U.S. 78, 85-88 (1944) (veracity of a religious belief may not be assessed by jury).

In short, the Church's church-autonomy defense to this suit cannot be defeated by resorting to the "neutral-principles" doctrine articulated in *Jones*.

## CONCLUSION

Reversing the decision below and allowing Appellants' suit to proceed would plainly violate the First Amendment by injecting courts into a religious dispute over the meaning of a religious doctrine—tithing—and into matters of internal governance involving major decisions about how to spend religious donations to further a church's mission. It was to avoid such entanglement of church and state that the Establishment Clause was adopted. And allowing the Appellants' claims to proceed would violate that Clause as well as the Free Exercise Clause that, together, protect a religious organization's ability to decide for itself matters of church doctrine and governance.

For those reasons, in addition to those embraced by the district court, the decision below should be affirmed.

Dated: September 29, 2025

Respectfully submitted,

*/s/ Gene C. Schaerr*
Gene C. Schaerr
James C. Phillips
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(g)(1) and 29(a)(5), I certify that this brief:

(i) complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,487 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 10th Circuit Rule 32(B), as determined by the word counting feature of Microsoft Word; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 10th Circuit Rule 32(A) because it has been prepared using Microsoft Office Professional 2016, set in Times New Roman 14-point font.

Dated: September 29, 2025

*/s/ Gene C. Schaerr*
Gene C. Schaerr

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing brief:

(1)     all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)     the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender, and according to the program are free of viruses.

Dated: September 29, 2025

*/s/ Gene C. Schaerr*
Gene C. Schaerr

# APPENDIX

## List of *Amici Curiae*

The Ethics and Religious Liberty Commission of the Southern Baptist Convention
https://erlc.com/

General Conference of Seventh-day Adventists
https://gc.adventist.org/

Lutheran Church–Missouri Synod
https://www.lcms.org/

The First Church of Christ, Scientist
https://www.christianscience.com/

Church of Scientology
https://www.scientology.org/

International Church of the Foursquare Gospel
https://www.foursquare.org/

BAPS Swaminarayan Sanstha
https://www.baps.org/

American Islamic Congress
https://aicongress.org/

Jewish Coalition for Religious Liberty
https://www.jcrl.org/

United Muslims of America Interfaith Alliance
https://www.umaia.net/